**CHRYSLER CORPORATION and Chrysler Motors Corporation, Plaintiffs-Appellees,**

v.

**Vincent L. TOFANY and William E. Kirwan, Defendants-Appellants.**

**CHRYSLER CORPORATION and Chrysler Motors Corporation, Plaintiffs-Appellees,**

v.

**James E. MALLOY and Raymond E. Grout, Defendants-Appellants.**

**Nos. 13 and 73, Dockets 33497 and 33509.**

United States Court of Appeals
Second Circuit.

Argued Sept. 16, 1969.

Decided Nov. 7, 1969.

---

11. Presently Section 2056(a), (b) (4) (A) without any significant change in statutory language.

Robert L. Ackerly, Washington, D. C. (W. Stanfield Johnson, Sellers, Conner & Cuneo, Washington, D. C., Francis S. Bensel, Robert M. Davidson, Kelley, Drye, Newhall, Maginnes & Warren, New York, N. Y., on the brief), for plaintiffs-appellees Chrysler Corporation and Chrysler Motors Corporation.

Jeremiah Jochnowitz, Albany, N. Y. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Ruth Kessler Toch, Sol. Gen., on the brief), for defendants-appellants, Vincent L. Tofany and William E. Kirwan.

Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C. (William D. Ruckelshaus, Asst. Atty. Gen., Morton Hollander, Atty., Washington, D. C., on the brief), for the United States as amicus curiae.

William T. Keefe, Burlington, Vt., for the State of Vermont.

John H. Pickering, William R. Perlik, Timothy B. Dyk, Michael R. Klein, Washington, D. C.; Allen F. Maulsby, Cravath, Swaine & Moore, New York City, on the brief, for Automobile Manufacturers Association, Inc., as amicus curiae.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge.

These consolidated appeals by public officials of the states of Vermont and New York arise from declaratory judgments and accompanying orders in favor of Chrysler Corporation and Chrysler Motors Corporation ("Chrysler") entered by the United States District Courts for the District of Vermont and the Northern District of New York. Both district courts held that state regulation of Super Lite, an extra headlamp offered as an optional accessory on some of Chrysler's 1969 Dodge automobiles, is preempted by the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381–1425 (Supp. III 1966) (the "Act"), and Federal Motor Vehicle Safety Standard No. 108, 49 C.F.R. § 371.21 (1969) [1] ("Standard No. 108"), issued pursuant to the federal statute. The Vermont dis-

---

1. The citation indicates where Standard No. 108 may presently be found. The Secretary of the Department of Transportation issued the original version of Standard No. 108 on January 31, 1967, effective January 1, 1968. It was published at 23 C.F.R. § 255.21. The present Standard No. 108 was promulgated on December 11, 1967, effective January 1, 1969. The original version, which was in effect when these cases arose, does not differ from the cited version in any respect relevant to these cases. See Chrysler Corporation v. Malloy, 294 F. Supp. 524, 529 (D.Vt.1968).

trict court entered judgment for Chrysler after a trial and the New York district court granted plaintiff Chrysler's motion for summary judgment. Both courts enjoined the defendant state officials from attempting to regulate Chrysler's sale of automobiles equipped with Super Lite. Since we disagree with the district courts on the issue of federal preemption, we reverse both judgments.

## I. *The Facts*

Chrysler designed and installed the additional headlamp called Super Lite as optional equipment on certain models in its 1969 Dodge line of automobiles. According to Chrysler, the purpose of Super Lite is to produce additional forward visibility by supplementing the regular low-beam headlamps with a controlled, rectangular beam of light produced by a new type of bulb and a new optical principle. The 1969 Dodge line was introduced nationally on September 19, 1968, but even before that date Chrysler's troubles with Super Lite began.

Prior to the introduction date, defendants Malloy and Grout, officials of the state of Vermont,[2] required Chrysler to submit Super Lite to them for presale approval under the applicable Vermont statutes.[3] Just prior to September 19th, the Vermont officials advised Chrysler that the sale of cars equipped with Super Lite without the approval of the Vermont Commissioner of Motor Vehicles would violate state law. Since approval had not been granted, on September 19, 1968, Chrysler filed a complaint in the district court in Vermont seeking a declaratory judgment that the attempted state regulation of Super Lite was preempted by the federal Act and Standard No. 108. The complaint also sought a temporary restraining order and a permanent injunction against state restrictions on the sale of Dodges equipped with Super Lite.

In mid-October, 1968, defendants Tofany and Kirwan, officials of the State of New York,[4] orally advised Chrysler that 1969 Dodges with Super Lite did not comply with the requirements of the New York State Motor Vehicle Code.[5]

---

2. Defendant-appellant James E. Malloy is the Commissioner of Motor Vehicles and defendant-appellant Raymond E. Grout the Deputy Commissioner of Motor Vehicles of Vermont.

3. Under the Vermont statutes, the Commissioner of Motor Vehicles is given authority to test headlamps submitted by a motor vehicle manufacturer for approval. 23 Vt.Stat.Ann., ch. 13, § 1247(a) (1967). It is illegal to operate a motor vehicle in Vermont if that vehicle is equipped with a lighting device in excess of four candlepower unless it has been approved by the Commissioner. 23 Vt.Stat.Ann., ch. 13, § 1246 (1967). As Judge Leddy stated in Chrysler Corporation v. Malloy, *supra* note 1, 528. "Although the Vermont statutes do not expressly state this, it can be safely assumed that the Commissioner has the power to refuse to pass in the periodic motor vehicle inspections any motor vehicle equipped in violation of section 1246. See 23 V.S.A. § 1002, 1222."

4. Defendant-appellant Vincent L. Tofany is the Commissioner of the New York Department of Motor Vehicles and defendant-appellant William E. Kirwan is

Superintendent of the New York State Police.

5. A New York statute states that "No headlamp shall be used upon any motor vehicle * * * operated on the public highways of this state, unless such lamp is approved by the commissioner or is equipped with a lens or other device approved by the commissioner." N.Y. Vehicle and Traffic Law § 375(4) (McKinney's Consol.Laws, c. 71, 1960); see also, *id.*, § 375(6), which provides for various methods of submitting headlamps to the commissioner for approval and testing. The latter section also states that the commissioner is to measure the performance of new lamps against the substantive requirements of section 375. See note 6, *infra*. If he refuses to approve a lamp, the commissioner must state his reasons for refusal in writing. N.Y. Vehicle and Traffic Law, *supra*, § 375(6).

The New York Commissioner of the Department of Motor Vehicles presented affidavits of five state officials who had participated in driving tests of Super Lite. These affidavits cited both the glare and dazzle effect and the blue flashing effect. Similar affidavits and testimony were present in the Vermont action.

Chrysler promptly sought declaratory and ancillary injunctive relief in the Northern District of New York.

Chrysler's complaint in the New York action stated that Super Lite "provides the driver of the vehicle with additional night visibility, primarily to permit safe driving on high speed highways without the glaring effects of high beam headlamps on other drivers on the highway." The record before us indicates that both the New York and Vermont officials were quite concerned about the effect on other drivers of the glare which Super Lite produced when used on hilly or winding two-lane roads.[6] Since Vermont and many areas of New York have a predominance of such roads, unlike the midwestern, prairie or southwestern states, this finding was of special importance. In addition, officials of both states expressed some concern that the new Chrysler option emitted a blue glow which appeared at times to flash. Since both states reserve the use of blue signal lights for certain emergency vehicles, this

was a further reason for prohibiting the sale of Super Lite.[7] The propriety of these conclusions by state officials is not before us on these appeals; we are faced with only the narrow legal question of federal preemption.

Meanwhile, state officials in New Hampshire expressed similar concern about Super Lite. On September 18, 1968, they wrote a letter to all automobile dealers in the state which declared, in effect, that Super Lite had not been approved by the New Hampshire Division of Motor Vehicles and that cars equipped with the extra light would therefore "not be able to be inspected" as required by state law. Chrysler sought declaratory and injunctive relief in federal district court in New Hampshire on September 19, 1968.

Before any of the states had attempted to ban Super Lite, Chrysler was in contact with the Federal Highway Administration, the agency within the Department of Transportation charged with administering the federal Act. On Sep-

---

6. The statutes of both states deal with glare. In the New York Vehicle and Traffic Law, it is required that "[a]ll lamps used on a motor vehicle * * * shall be so arranged, adjusted and operated, as to avoid dangerous glare or dazzle." N.Y. Vehicle and Traffic Law § 375(2) (b).

In Vermont, this consideration is expressed less directly. Section 1246 of the Vermont motor vehicle statutes provides that a person may not use on a vehicle a lighting device of over four candlepower equipped with a reflector unless: (1) the device is approved by the commissioner and (2) the beam reflected from the device, when measured seventy-five feet or more ahead of the lamp, does not "rise more than six inches above the height of the bulb in such lamp and in no event more than forty-two inches from the level surface on which the vehicle stands under all conditions of load." 23 Vt.Stat.Ann., ch. 13, § 1246 (1967); for an indication that this section is designed to deal wtih glare, see Labrecque v. American News Co., 115 Vt. 305, 58 A.2d 873 (1948).

7. Section 375 of New York's Vehicle and Traffic Law reserves the use of blue lights

to local fire officials and volunteer firemen. N.Y. Vehicle and Traffic Law, supra note 5, § 375(2) (c). The blue flashing effect of Super Lite is described in the affidavits submitted by New York officials in the New York action. See note 6 supra.

In Vermont, a recent amendment to the motor vehicle statutes (effective July 1, 1968) provides that "[n]o motor vehicle shall be operated upon a highway of this state equipped with a * * * colored signal lamp visible from the front of the motor vehicle unless a permit authorizing such equipment, issued by the commissioner of motor vehicles, is carried in the vehicle." 23 Vt.Stat.Ann., ch. 13, § 1251 (Supp.1969). The next section authorizes the commissioner to issue permits for "[s]irens and/or blue or blue and white signal lamps for all law enforcement vehicles." Id., § 1252. Although these provisions were not cited by the State of Vermont in its brief submitted to this court, the record indicates that in the proceedings before Judge Leddy there was testimony about the blue color of Super Lite; in addition, the court received as exhibits comparative color photographs of Super Lite and of a police cruiser equipped with a blue signal light.

tember 11, 1968, Chrysler's "Federal Safety Coordinator" wrote to the National Highway Safety Bureau, an arm of the Federal Highway Administration. Chrysler included with its letter technical data for Super Lite, and it stated that it intended to offer the extra headlamp as an option on some of its 1969 models. Dr. William Haddon, Jr., Director of the Bureau, replied in a letter dated September 17, 1968, which made clear the agency's position on the issue of federal and state regulation of Super Lite. Dr. Haddon stated, in part:

> You are correct in your understanding that a supplemental light of this type is not required by Federal Motor Vehicle Safety Standard No. 108.

8. Dr. Haddon's letter to Chrysler included the following concluding paragraph:

   With respect to the requirements of Standard No. 108, I must point out that this Bureau does not issue approvals on items of lighting equipment or on vehicle designs incorporating this equipment. Therefore, the above comments are for your information only and in no way relieve the vehicle manufacturer from his responsibility for certifying that the assembled vehicle meets the requirements of the standard.

The view of Super Lite and Standard No. 108 expressed in Dr. Haddon's letter is consistent with the position on additional lights which agency officials set forth in a general Safety Standards Meeting, held September 6, 1967, at which motor vehicle manufacturers and other interested parties discussed, *inter alia*, revised Standard No. 108 with technical representatives of the National Highway Safety Bureau. The transcript of this meeting indicates that four representatives of Chrysler attended.

There were several questions concerning what is now § 3.1.2 of Standard No. 108; the language which the meeting discussed was: "Additional lamps, reflective devices, and associated equipment may be installed, provided they do not impair the effectiveness of the required equipment." In response to requests to clarify this language, agency representatives stated:

   It is not our intent to insist on a right of manufacturers to install any additional lights that they wish, whether or not they impair the effectiveness of existing lights. We do recognize that, for

Standard No. 108 does, however, specify, in Paragraph S3.1.2, that no additional lamp, reflective device, or associated equipment shall be installed if it impairs the effectiveness of the required equipment. On the basis of our review of your technical literature on the Super Lite and our observation of limited field demonstrations of the light, it does not appear that the Super Lite will impair the effectiveness of the lighting equipment required by Standard No. 108. It should be noted, however that, while the incorporation of this lamp in your 1969 automobiles would not be precluded by the Federal Standard, the various states may interpose restrictions as to this lamp.[8]

instance, the states might want to restrict the number of vehicles that have rotating red beacons on the roof and this sort of thing. It might be better stated, if we had indicated that additional lights impairing the effectiveness will not be permitted, rather than the wording we have here, because this is what we want.

It is worth mentioning that the Standard as published in the Code of Federal Regulations is couched in the negative rather than the positive.

In response to a question from a manufacturer about mounting additional clearance lamps and reflectors, a Federal Highway Administration official stated:

   As far as our standard is concerned, as long as they meet the requirements stated in the standard, with a set of devices, then we are not controlling where additional devices are installed.

   Now, it may be that the states would have an interset in providing additional restrictions that are not, I might say, related to the same aspect of safety. It gets into a pretty complicated area. and I think it deserves a lot of additional discussion—probably not at this meeting, however.

Additional discussion did occur. A Department of Transportation attorney responded to a question about the relative roles of the states and the federal government as follows:

   I think the Safety Act in section 103 (d) [the preemption section] makes it clear that the states are permitted to specify requirements for aspects of safety which are not covered by the Federal Standards, and I believe the paragraph

All three federal districts courts granted Chrysler's requests for temporary injunctive relief. On December 5, 1968, however, Judge Bownes of the District of New Hampshire rendered a final decision in favor of the defendant New Hampshire officials. Chrysler Corporation v. Rhodes, 294 F.Supp. 665 (D.N.H. 1968). This decision was affirmed by the First Circuit, 416 F.2d 319 (1st Cir. June 26, 1968), and Chrysler's petition for a rehearing was denied. 416 F.2d 324 (1st Cir. July 25, 1968).

However, in the Vermont action, Judge Leddy held for the plaintiff Chrysler on December 30, 1968. Chrysler Corporation v. Malloy, 294 F.Supp. 524 (D.Vt. 1968). Over two months later, Judge Foley of the Northern District of New York, relying heavily on Judge Leddy's opinion, granted Chrysler's motion for summary judgment. Chrysler Corporation v. Tofany, 305 F.Supp. 971 (N.D. N.Y. March 13, 1969).

## II. *The Federal Regulatory Scheme*

The Act directs the Department of Transportation to establish Federal Motor Vehicle Safety Standards, 15 U.S.C. § 1392(a). Each standard is to be a "minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." In issuing a standard, the Department must consider whether the proposal is "reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed" and the extent

to which it "will contribute to carrying out the purposes of" the Act. 15 U.S.C. §§ 1392(f) (3), 1392(f) (4). The Department is also to consult with other public agencies and to consider other relevant motor vehicle safety data when it deems it appropriate. 15 U.S.C. §§ 1392(f) (1), 1392(f) (2). The Department must, when issuing standards, comply with the rulemaking provisions of the Administrative Procedure Act. 15 U.S.C. § 1392(b).

Once standards have been promulgated, each automobile manufacturer must certify that "each such vehicle or item of motor vehicle equipment conforms to all applicable Federal motor vehicle safety standards." 15 U.S.C. § 1403. The Act provides for civil penalties, and the United States is also permitted to seek injunctive relief in federal district courts to restrain violations of the Act. 15 U.S. C. §§ 1398, 1399.

Pursuant to this authority, the Secretary of the Department of Transportation issued the initial set of standards on January 30, 1967. The Secretary then delegated the power to establish standards to the Administrator of the Federal Highway Administration; the Administrator has since amended some of the original standards and has added several new standards.[9]

The standard with which we are concerned is Standard No. 108. According to its "purpose and scope" section, Standard No. 108 "specifies requirements for lamps, reflective devices, and associated equipment, for signalling and to enable safe operation in darkness and other

---

that we just discussed * * * also reflects the same intent.

Finally, a representative of the California Highway Patrol asked: "Did any additional device that they install have to comply with the mounting and location requirements of your standards? Apparently not, is this correct?" A federal official answered: "Yes, this is correct, and this would be an area in which the state could exercise whatever authority it felt appropriate."

We have presented these comments in some detail to show that state regulation

of additional lighting equipment could not have come as a complete surprise to Chrysler, despite its assertion that it relied on Standard No. 108's preemptive effect.

9. The Federal Highway Administration is also considering a number of proposals for new or amended standards in many areas of motor vehicle safety including basic motor vehicle equipment, crash worthiness, and post-crash hazards.

conditions of reduced visibility." All that this provision does is to inform the reader in a very general way what kind of requirements the standard will impose. The requirements themselves are contained in a number of subsections and four detailed tables; the sum and substance of these requirements is that all new cars must come equipped with certain items of lighting equipment and that the required items must meet specific levels of performance. There are many kinds of lamps which are not required: fog lamps are not mentioned, and interior lighting is not covered. Additional headlamps such as Super Lite are not required by Standard No. 108. However, S3.1.2 of Standard No. 108 does provide that "[n]o additional lamp, reflective device, and associated equipment shall be installed if it impairs the effectiveness of the required equipment."

The preemptive effect of the many existing standards is governed by section 1392(d) of the Act, which states:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.

This provision indicates that state regulation of an item of motor vehicle equipment will be preempted only if the following factors appear in combination: (1) a federal standard in effect which covers that item of equipment; (2) a state safety standard (here, attempted state regulation pursuant to state statutes) for the item which is not identical to the federal standard; and (3) application of the state and federal regulations to "the same aspect of performance" of the item of equipment.

The federal Act does not contain any provision requiring automobile manufacturers to submit new equipment items to the Federal Highway Administration for presale approval. Thus, many new items of automotive equipment may be developed each year which were never contemplated by the draftsmen of the then current federal standards. If the standards existing at any one point in time were given the broadest possible preemptive effect, the practical result would be to allow these new items to be sold without adequate regulation. Even assuming that a potentially dangerous new equipment option was somehow brought to the attention of the federal authorities prior to its introduction, it would take some time before an amendment or a new federal standard to cover such an item could be promulgated. As noted above, orders establishing or amending standards are subject to the notice and publication requirements of the rulemaking provisions of the Administrative Procedure Act. 5 U.S.C. § 553 (1964). In addition, the Act itself states that:

> Each order establishing a Federal motor vehicle safety standard shall specify the date such standard is to take effect which shall not be sooner than one hundred and eighty days * * *, unless the Secretary finds, for good cause shown, that an earlier * * * effective date is in the public interest, and publishes his reasons for such finding. 15 U.S.C. § 1392(c).

It is difficult to predict whether these time restrictions on the effectiveness of new or amended standards could be circumvented in a particular case. However, it is sufficient to note that there is a substantial possibility that a federal response to a new equipment option

would be delayed for several months at the very least.[10] In the interim, it is conceivable that traffic accidents caused in whole or in part by the new item of equipment would occur were the states powerless to act.

The states are better suited to act promptly in this field than is the federal government under the present regulatory scheme. First, as the present cases demonstrate, many states do have presale approval provisions or procedures which apply to some items of automotive equipment. Moreover, the states can act swiftly; in the instant cases, officials of Vermont and New York promptly conducted tests of Super Lite and concluded that it was a hazard to other drivers. Accordingly, they sought to bar it from the highways. It is reasonable to expect that if a number of states reacted to Super Lite, either affirmatively or negatively, it would soon come to the attention of the federal authorities. At that time, after a body of test data was developed, the Federal Highway Administration might well take action to regulate Super Lite specifically.

It is of course possible that the states would disagree as to the merits of a particular item of equipment such as Super Lite.[11] In *Rhodes,* the First Circuit noted that a manufacturer faced with such a dilemma had at least two alternatives for accommodating innovations in vehicle equipment.

A manufacturer could, as Chrysler failed to do here, exhaust avenues of state law. Secondly, a manufacturer could seek to have an existing federal standard expanded to cover a new device. 15 U.S.C. § 1392(c). *Rhodes, supra,* 416 F.2d at 324.

---

10. Chrysler argues that federal officials have the authority to deal with items such as Super Lite, if they prove to be hazardous, under § 1402(e) (2) of the Act, which states:

> If through testing, inspection, investigation, or research carried out pursuant to this subchapter, or examination of reports pursuant to section (d) of this section [e. g. manufacturers' notices to dealers and/or purchasers concerning defects], or otherwise, the Secretary determines that any * * * item of motor vehicle equipment—
>
> * * * * *
>
> (2) contains a defect which relates to motor vehicle safety; then he shall immediately notify the manufacturer of such * * * item of motor vehicle equipment of such defect. * * * 15 U.S.C. § 1402(e).

However, proceedings to regulate every potentially hazardous option under this subsection also would not be without delays. First, as noted in the body of this opinion, the agency has no presale approval powers. Thus, it would have to rely primarily on "inspection and investigation." As the Department of Transportation points out in its *amicus* brief filed in these actions, the Federal Highway Administration has less than ten men available for such inspection of vehicles on the national market.

But a more fundamental objection is that this is essentially an after-the-fact approach. There is still a danger that a hazardous option would be on the market for many weeks before the federal government was able to act. Even if relatively prompt agency action was taken, section 1402(e) requires the Secretary to afford the manufacturer an opportunity to present its views and evidence to establish that the alleged defect does not affect motor vehicle safety. Assuming that all of this could be concluded swiftly and that the Secretary found that such defect affected motor vehicle safety, section 1402 (e) merely provides that the Secretary shall direct the manufacturer to notify by certified mail purchasers of the item in question that it is a defect relating to safety. This form of federal regulation would still permit undesirable delays before a dangerous new equipment option was subjected to governmental scrutiny.

11. As Chrysler has stressed throughout this litigation, California views Super Lite as an "advancement" which improves "the visibility distance of headlamps on low beam." We would only note again that road conditions vary throughout the nation, and that motor vehicle safety demands an immediate regulatory response to new items of automotive equipment. The fact that the states differ on Super Lite should indicate to the federal authorities a need to consider whether the existing standard should be modified to encompass Super Lite, or whether differences in highway conditions justify the differences in result.

As we will explain more fully below, it seems to us that the most important consideration must be that a new equipment option which presents a potential safety hazard is a proper subject for the immediate exercise of the state police power. ·Given the present structure of the federal regulatory scheme and the Congressional purpose in passing the Act, the states are free to assume this role.

### III. *Congressional Intent*

■ The Act and the standards issued under it must of course be interpreted in accordance with Congressional intent. The clearest possible expression of legislative purpose is provided in the first section of the Act itself: "the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381.

Chrysler argues that Congress was primarily interested in establishing uniform regulation of the safety aspects of motor vehicles and items of motor vehicle equipment. It relies heavily on the report of the Senate Commerce Committee, which states:

> The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country. S.Rep. No. 1301, 89th Cong., 2d Sess., 1966, 2 U.S.Code Cong. & Admin.News 1966, p. 2720.

However, this statement, quoted in Chrysler's brief, is followed by these comments:

> At the same time, the committee believes that the States should be [left] free to adopt standards identical to the Federal standards, which apply only to the first sale of a new vehicle, so that the States may play a significant role in the vehicle safety field by applying and enforcing standards over

the life of the car. Accordingly, State standards are preempted only if they differ from Federal standards applicable to a particular aspect of the vehicle or item of vehicle equipment * * *. *Id.*

Most important, this report was written before the crucial "aspect of performance" language was inserted into the preemption section. See Chrysler Corporation v. Rhodes, *supra,* 416 F.2d at 323, n. 5. This phrase first appeared in the House version of the bill, and it was adopted and expanded by the Conference Committee which altered the Senate bill before it was finally passed. *Id.;* see also Conf.Rep.No.1919, 89th Cong., 2d Sess., 1966, 2 U.S.Code Cong. & Admin.News 1966, pp. 2732–2733. We also note that the Senate Commerce Committee report contains language to the effect that the legislation was needed to promote traffic safety and to reduce accidents. S.Rep. No. 1301, *supra,* at 2709–2710. In discussing the promulgation of standards, the Senate Commerce Committee stated that it intended "that safety shall be the overriding consideration in the issuance of standards under this bill." *Id.* at 2714. The Conference Report which accompanied the final version of the Senate bill describes the Act as one "to provide for a coordinated national safety program and establishment of safety standards for motor vehicles in interstate commerce to reduce accidents involving motor vehicles and to reduce the deaths and injuries occurring in such accidents * * *." Conf.Rep. No. 1919, *supra,* at 2731.

Thus, although Chrysler stresses that Congress decreed uniformity, the clear expression of purpose in section 1381 and the other evidence of legislative intent indicate that the reduction of traffic accidents was the overriding concern of Congress. We think that these expressions of legislative purpose should govern our assessment of the preemptive effect of the Act and the standards issued under it.

## IV. Federal Preemption of State Regulation of Super Lite

Our previous discussion of the preemption section of the Act makes it clear that we must examine Standard No. 108's relation to Super Lite in the following manner. First, we must decide whether Standard No. 108 applies to Super Lite at all. Second, if we find that Standard No. 108 does cover Super Lite, we must determine the aspects of Super Lite's performance to which it applies.

### A. Standard No. 108's Application to Super Lite

In *Rhodes,* the First Circuit held that the issue which was determinative of the appeal was "whether there is an existing federal standard applicable to 'Super Lite.'" Chrysler Corporation v. Rhodes, *supra,* 416 F.2d at 321. The court went on to hold that Standard No. 108 did not apply to Super Lite; in denying Chrysler's petition for a rehearing, the court stated:

> At no point does standard no. 108 purport to cover a category of lighting equipment which would encompass 'Super Lite.' We therefore fail to see how the standard could be read to relate to any 'aspect of performance' of 'Super Lite.' *Id.,* 416 F.2d at 325.

■ We agree with the First Circuit that "resort must be had to the specific requirements and categories of the standard in order to give meaning to the vaguely-worded purpose and scope provision." *Id.* However, it seems to us that such an analysis must lead to the conclusion that Super Lite is covered by Standard No. 108, if only to a very limited extent.

■ When the whole of Standard No. 108 is examined, it is apparent that its sole purpose is to assure that all new automobiles come equipped with certain items of lighting equipment which operate in accordance with the detailed performance requirements which are indicated. Chrysler is obviously correct that additional lighting—a category into which Super Lite fits—is mentioned, but the stated purpose of subsection S3.1.2 is to prevent any extra lighting equipment from interfering with the operation of the required lights. It would be overly restrictive to conclude that lights such as Super Lite are not covered. Thus, it becomes crucial to decide what aspect of Super Lite's performance Standard No. 108 applies to.

### B. "The Same Aspect of Performance"

Judges Leddy and Foley both held that the "aspect of performance" language in the preemption section of the Act should be construed broadly. In accordance with this view, Judge Leddy saw Standard No. 108 "as attempting to protect other users of the highway since in conditions of reduced visibility their safety on the roads may be jeopardized by the presence of a motor vehicle with a less than effective headlamp system." Chrysler Corporation v. Malloy, *supra,* 294 F.Supp. at 531.

It is apparent that in reaching their conclusions about the scope of the "aspect of performance" language and Standard No. 108, both district judges were impressed by Chrysler's argument that Congress' purpose was to create a uniform set of standards. See Chrysler Corporation v. Tofany, *supra,* at 974; see also Chrysler Corporation v. Malloy, *supra,* 294 F.Supp. at 531.

Judges Leddy and Foley both decided that "aspect of performance" should be read broadly and that Standard No. 108, primarily through S3.1.2, did apply to the same aspect of performance of Chrysler's Super Lite that the states sought to regulate.

In our view, this analysis does not take proper account of the purpose of the Act as set forth in section 1381 and the other statements quoted above. Both the "aspect of performance" language of section 1392(d) and the coverage of Standard No. 108 should be construed with these indications of intent in mind. Approaching the question from this per-

spective, it would be anomalous to construe the preemption section and Standard No. 108 broadly when the practical effect of such construction would be to exclude many new items of motor vehicle equipment from prompt regulation at either the state or federal level. As the First Circuit stated in *Rhodes:*

> Acceptance of Chrysler's position might well be contrary to the central purpose of the Act—the promotion of safety on the nation's highways. To hold that the mere promulgation of a general purpose sought to be achieved by a federal safety standard would preempt all state regulation in a vaguely described area would result in a 'no man's' land with respect to categories of equipment which the federal standard does not yet seek to regulate. On the other hand, should state regulation prove to be undesirable, preemption may be easily accomplished by the amendment of federal standards to extend their coverage. Chrysler Corporation v. Rhodes, *supra,* 416 F. 2d at 325.

We recognize that the analysis presented in our Brother Friendly's concurrence is not without logical appeal. However, it assumes that the "aspect of performance" concept is one which can be easily applied by all concerned parties—the federal authorities, the manufacturers, and state officials—in a wide variety of as-yet-unknown fact situations. The diversity of opinion produced by the instant litigation and by the *Rhodes* case, all of which involve but one basic factual pattern, counsels against such an assumption. Our narrow interpretation of the phrase "aspect of performance" and of the scope of the coverage of Standard No. 108 is thus a purposeful one; we think it clear that it was not the intent of Congress to foster in the states a hesitancy to act if there is an ambiguity as to the nature and extent of coverage of a particular federal standard. To reiterate, it seems to us that this is the wisest path to follow in view of the fact that many new items of automotive equip-

ment are marketed each year and the Federal Motor Vehicle Safety Standards in effect during any such year were drafted without knowledge or consideration of the existence of such items.

Chrysler argues that the preemption section itself supports the theory that uniformity of regulation was Congress' primary objective. Section 1392(d), it is said, describes the one situation in which the states are permitted to impose standards stricter than those set by the minimum federal standards—that is, in the procurement of vehicles for their own use. To the contrary, we think that this portion of the preemption section, which allows not only states but also the federal and local governments to impose upon manufacturers safety standards higher than those set in the federal standards when buying cars for their own use, further undercuts the analysis of the district courts. This part of section 1392(d) means, for example, that the General Services Administration could require all manufacturers to include on all automobiles purchased by it for the federal government's fleet a pair of dual headlamps instead of merely a pair of single headlamps—an arrangement which is permitted by Standard No. 108. See Standard No. 108, Table III. State and local governments are also free to impose any number of stricter safety standards for cars which they buy for their fleets. This provision appears to be an implicit rejection of the overriding importance of uniformity.

### V. *Conclusion*

In light of these considerations, we conclude that the "aspect of performance" language in the preemption section of the Act must be construed narrowly. We concede, as the First Circuit was unwilling to do, that Standard No. 108 does cover Super Lite. But the coverage is limited severely by the terms of S3.1.2. This subsection of Standard No. 108 is so general that a practical construction of the phrase "impairs the effectiveness of the required equipment" means that an item such as

Super Lite is covered only if it physically obstructs the light emitted by the required lamps or if it causes some type of electrical interference with the required lights. Thus, we hold that Standard No. 108 is concerned only with the effects, if any, which Super Lite has on the operation of the required lights so as to reduce or impair the vision of a driver operating a car equipped with Super Lite in darkness or some other condition of reduced visibility. Given the language and structure of Standard No. 108, we do not believe that it can or should be interpreted to apply to any effects which Super Lite may have on the drivers of other vehicles. Since this is the area in which both Vermont and New York have raised objections to the use of Super Lite, their attempts at regulation are not preempted.

The result which we have reached is consistent with recent authority on the general question of federal preemption. As the First Circuit pointed out, "it is well-settled that where the state's police power is involved, preemption will not be presumed." Chrysler Corporation v. Rhodes, *supra,* 416 F.2d at 324 n. 8; Brotherhood of Locomotive Engineers v. Chicago R.I. & R.R. Co., 382 U.S. 423, 86 S.Ct. 594, 15 L. Ed.2d 501 (1966); Missouri Pacific R. Co. v. Norwood, 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010 (1931). Although the *Engineers* case involved a federal statute which contained no express preemption provision, the parties urging preemption contended, much as Chrysler does here, that the terms of the federal act involved in that case were inconsistent with the operation of the challenged state laws. We have already stated that the express purpose of the federal statute before us is the reduction of traffic accidents. Uniformity through national standards is of course desirable, but in these cases it is truly a secondary objective. What is perfectly safe on straight roads over the flat terrain of states such as Texas, Oklahoma, and Kansas may be very hazardous on hilly, winding roads in Vermont and New York. If traffic safety is furthered by a traditional type of state regulation under the police power, as we feel that it is here, a narrow construction of the preemptive effect of the federal Act and Standard No. 108 is required. See Chrysler Corporation v. Rhodes, *supra,* 416 F.2d at 323.

In Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 141–142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the Supreme Court stated:

Whether a State may constitutionally reject commodities which a federal authority has certified marketable depends upon whether the state regulation 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress * * *. The test of whether both federal and state regulations may operate, or the state regulation must give way is whether both regulations can be enforced without impairing the federal superintendence of the field * * *.

Applying this test to the cases before us, it is evident that regulation by Vermont and New York is not preempted. Even if the Federal Highway Administration's failure to take any steps to restrict the sale of cars with Super Lite is construed as an "approval" of that option, the scope of such approval is necessarily limited to the aspect of Super Lite's performance which Standard No. 108 covers. State regulation of a different aspect of performance does not conflict with the operation of the federal scheme; rather, it seems to have been contemplated as a contribution to the "execution of the full purposes and objectives of Congress."

Our conclusion in these cases is further strengthened by the fact that it is in accord with the position of the Federal Highway Administration, presented to us in an *amicus* brief filed

by the United States,[12] that Standard No. 108 was never intended to deal with the aspect of performance of a light such as Super Lite which the states seek to regulate. As the Supreme Court stated in Thorpe v. Housing Authority of Durham, 393 U.S. 268, 276, 89 S.Ct. 518, 523, 21 L.Ed.2d 474 (1969):

> [W]hen construing an administrative regulation, 'a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. * * * [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'

The Federal Highway Administration's position is not clearly erroneous or inconsistent with either the purposes of the Act or of Standard No. 108. From what we have said, it should be clear that the agency's interpretation coincides both with a common-sense reading of the relevant provisions and with Congressional intent.

The judgments are reversed with directions to enter summary judgment in favor of the defendants in both cases.

The judgment for the plaintiffs in *Chrysler Corporation v. Malloy* and the summary judgment for the plaintiffs in *Chrysler Corporation v. Tofany* are reversed.

FRIENDLY, Circuit Judge (concurring in the result).

Although I agree that the orders granting permanent injunctions in favor of the plaintiffs should be reversed and, on a more limited basis, that summary judgment should be granted in favor of the states, I cannot follow the path the majority takes.

My most important objection is to the basic assumption that the preemption clause, § 1392(d), of the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381 et seq., should be narrowly construed. Such an approach seems to me to fly in the face both of the language of the Act and of the legislative history. The very existence of an express preemption clause is somewhat unusual. Moreover, this one was worded in the strongest possible terms. The prohibition is not simply against a state standard in conflict with the federal standard; Congress prohibited any state standard "applicable to the same aspect of performance which is not identical to the federal standard." To this mandate for the uniform application of Federal standards Congress made one narrow exception, and only one. Any government agency might require a higher standard of performance on vehicles purchased for its own use, something which it could have achieved by procurement policy even if the exception had not been stated.

The legislative history emphasizes that Congress meant just what it said. The extract from the Senate Committee Report quoted first in Part III of Chief Judge Lumbard's opinion is only part of the story.[1] The same report had earlier stated (p. 4):

> While the contribution of the several states to automobile safety has been significant, and justifies securing to the States a consultative role in the setting of standards, the primary responsibility for regulating the national automotive manufacturing industry

---

12. The United States also filed *amicus* briefs in the district courts in Vermont and New York, and in the First Circuit. Also appearing as an *amicus curiae* in several actions, including the present appeals, was the Automobile Manufacturers Association, Inc., which supported the position urged by Chrysler.

1. I fail to perceive how this is weakened by the passage subsequently quoted by the majority, affirming the role of the states in applying *identical* standards and enforcing them throughout the life of the car.

must fall squarely upon the Federal Government.[2]

The House Report also emphasized the need for a generous construction of preemption, H.R.Rep.No.1776, 89th Cong., 2d Sess. 17 (1966):

> Basically this preemption subsection is intended to result in uniformity of standards so that the public as well as industry will be guided by one set of criteria rather than by a multiplicity of diverse standards.

It is no answer that the overall objective of the Safety Act was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." Congress meant not simply to do this but to do it in a particular way, namely, by promoting national standards that would preempt any differing state ones, whether lower or higher, in order to assure manufacturers that if they met federal requirements, they could market their cars throughout the Union. Congress knew how much the topography of Vermont differs from that of Kansas as well as we do. It decided that nevertheless the gain from giving automobile manufacturers the incentives inherent in ability to rely upon a uniform nationwide standard and in freedom

from idiosyncracies of state regulators outweighed any possible losses. This is legislation in the great spirit of the Commerce Clause.

The majority's conclusions concerning the dire effect of reading the statute to mean what it says appear to rest on some serious misconceptions. As the scope of preemption is circumscribed, the states' responsibility for safety correspondingly increases. While the opinion considers this to be all to the good, I have no sufficient basis for thinking it to be; in any event, and much more importantly, Congress evidently thought the contrary.[3] The opinion's assumption that many states require pre-sale approval of any new item of equipment seems in conflict with the statement of the Senate Committee just quoted in the footnote. Furthermore, a proper interpretation of the preemption clause does not prohibit the enforcement of requirements of pre-sale approval like New York's and Vermont's, as the majority assumes. It means only that states having a requirement for pre-sale approval must apply this in conformity with the Federal standard.[4] The regulatory gap feared by the majority would thus exist only if § 1392(d) were to be read so

---

2. See also the statement by Senator Magnuson, Chairman of the Senate Committee:

> * * * the bill suggests to States that if we set a minimum standard, a car complying with such standard should be admitted to all States.

112 Cong.Rec. 13585 (1966).

3. Yet, with the exception of a handful of State regulations and the Federal seat belt and brake fluid laws, the automobile sold generally in interstate commerce is today subject only to the standards produced by the committees of the Society of Automotive Engineers. These SAE standards are the product of a committee consensus, subject to a single manufacturer's veto, while affording no consumer or user representation. Compliance is voluntary. There exist no procedures to compel their adoption, monitor their use, or evaluate their effectiveness. S.Rep. No. 1301, 89th Cong., 2d Sess. (1966), 1966 U.S.Code Cong. & Admin. News, p. 2711.

4. The position was correctly stated by Dr. Haddon, Director of the National Highway Safety Bureau, in a letter to Illinois authorities quoted in the Appendix in *Tofany:*

> It should further be noted that the [preemption] section deals only with what State standards may be in effect, and not the permissible extent of methods of their enforcement. Had Congress intended to make Federal enforcement of pre-sale standards exclusive, it could have simply barred State standards altogether, rather than requiring that they be "identical" where they deal with the "same aspect of performance."
>
> It is our position, therefore, that where State standards are validly in effect, Federal law does not exclude or restrict their enforcement either in regard to new (pre-sale) or used vehicles.

as to prohibit the states from acting when there was no Federal standard governing a particular "aspect of performance." But § 1392(d) does not say this, and no one could seriously contend for it.

My regret over the approach thus taken is all the greater because it seems unnecessary dictum. I completely accept the three-fold test stated by Chief Judge Lumbard in Part II immediately after the quotation of § 1392(d). I also join my brothers' holding, in disagreement with the First Circuit's in Chrysler Corporation v. Rhodes, 416 F.2d 319, 323 (1969), "that 'Super Lite' is covered by * * * Standard No. 108 * * *" However, I part company when the majority holds that the direction of § 3.1.2 that, "No additional lamp, reflective device, and associated equipment shall be installed if it impairs the effectiveness of the required equipment," refers only to cases where the added equipment "physically obstructs the lights emitted by the required lamps or * * * causes some type of electrical interference with the required lights." To read "effectiveness" as limited to the vision of the driver of the car carrying the lights without regard to the vision of the driver of an oncoming car that may crash into it is a strange construction of language.

The unreasonableness becomes all the more apparent when we realize that Super Lite is designed to be used only with low beam headlights and cannot be used independently or with high beams. Section 3.1.1(b) of Standard 108 makes low beam headlights required equipment and S.A.E. Standard J579a, incorporated by reference in Standard 108, sets down the specifications these lights must meet. The whole purpose of low beams is to avoid glare that would blind drivers of oncoming vehicles while, at the same time, giving sufficient illumination to the driver of the vehicle itself. If the only function of low beams were illumination, they would be unnecessary, since high beam headlights would suffice. All this is recognized in S.A.E. J579a, where the "lower beam" of a sealed beam unit is defined as

A beam low enough on the left to avoid glare in the eyes of oncoming drivers and intended for use in congested areas and on highways when meeting other vehicles within a distance of 500 ft.

If a supplementary light, such as Super Lite, is used in conjunction with low beams and creates the kind of glare low beams were intended to avoid, the low beams are no longer "effective" and, in terms of § 3.1.2, the supplementary light "impairs the effectiveness of the required [low beam headlights]." As Dr. Haddon put it in his deposition in the *Rhodes* case, the supplementary light "would tend to defeat the purposes of the performance required by the standard."[5] I thus find it impossible to avoid concluding that prevention of glare is an "aspect of performance" with which the Federal standard deals.

While this would mean that New York and Vermont could not adopt any different standard with respect to glare, it does not follow that they are precluded from objecting to Super Lite on the basis of a tendency to produce this. As previously indicated, the states remained free to enforce their laws requiring presale approval with respect to supplementary lights producing glare so long as they applied the Federal standard, to wit, impairing the effectiveness of the required lights. Plaintiffs did not negate

---

5. Dr. Haddon also stated

I'd also like to point out that we were perhaps leaning further than the evidence justified, the evidence available to us, at the time that we took that position in correspondence with the Chrysler Corporation, in that it may well be that such a lamp as the one at issue here does interfere with function, with the performance of the other lamps required. Now I'm not stating this as a conclusion but merely as a possibility which might come out of additional exploration. I'd be happy to elaborate further on that, if you would like.

No one liked.

the possibility that Super Lite might be found to do this. The term "glare" should be defined with reference to the Photometric Test Point values in S.A.E. J579a for low beams. These values are measured by locating the candlepower output of the light at specified points on a rectangular plane divided into equal quadrants. The points on the plane represent the angle in degrees of the beam emitted from the light source. Glare to oncoming drivers results from an excess of luminous intensity projected in the upper or lower left hand quadrant. For example, under S.A.E. J579a the maximum permissible candlepower for a low beam 1 degree left and ½ degree down in the lower left hand quadrant is 2000. If low beams were operating at that maximum, the addition of Super Lite would very likely push the total candlepower over the maximum permissible limit. The evidence submitted in these cases does not show that the state authorities lacked a substantial basis for such a conclusion.[6]

On the other hand, I believe this court's judgment in favor of the states is proper on the basis of their objection that Super Lite emitted a blue glow, whereas New York and Vermont reserve blue lights for emergency vehicles. The states' objection to this aspect of Super Lite's performance does not encompass any of the purposes sought to be achieved by the required lighting. Moreover, in order to determine whether Super Lite impairs the effectiveness of the required lighting there must be some measure against which the states' objection to Super Lite can be tested. Since Standard 108 supplies none with respect to color, § 3.1.2 does not preempt the states on this point. For similar reasons New York may also be entitled to summary judgment on the basis of its objection, not mentioned by the majority, that "Although illumination on the right hand side of the road was good, there was a tendency for the operator of the vehicle to oversteer or understeer on left turns, because the illumination on the right hand side of the vehicle was so brilliant that illumination to the left side became inadequate."

What these cases show above all is the need for the National Highway Safety Bureau to move swiftly to implement Congress' manifest intention and eliminate the scholastic distinctions and waste of effort which litigations such as these necessarily entail. One can only hope the majority's indication that the preemption clause is to be narrowly construed will not tempt the Bureau to rely on the false assumption that the duties Congress entrusted to it can be largely left with the states.

---

6. Dr. Haddon's letter of September 17, 1968 stating that no impairment of effectiveness was found "[o]n the basis of our review of your technical literature on the Super Lite and our observation of limited field demonstrations of the light" would not prevent a contrary state determination based on more complete analysis. The record does not disclose what tests the Federal agency performed.