Bruce W. BUZZARD, Administrator of the Estate of Deborah S. Buzzard, Bruce W. Buzzard, individually, and Bruce W. Buzzard, as parent and natural guardian of Lucas Buzzard, a minor

v.

ROADRUNNER TRUCKING, INC.; Roy L. Gerst; Freuhauf Trailer Operations, a division of Terex Trailer Corporations.

FREUHAUF TRAILER OPERATIONS; Roadrunner Trucking, Inc.; and Roy L. Gerst, Cross–Claimants,

v.

ROADRUNNER TRUCKING, INC. and Roy L. Gerst, Cross–Defendants,

Bruce W. Buzzard, Appellant.

No. 91–5628.

United States Court of Appeals, Third Circuit.

Argued Jan. 28, 1992.

Decided June 4, 1992.

George W. Westervelt, Jr. (Argued), Stroudsburg, Pa., for appellant.

Richard G. Fine, Fine, Wyatt & Carey, Scranton, Pa., for appellees Roadrunner Trucking, Inc. and Roy L. Gerst.

Morton F. Daller (Argued), Barbara H. Zurzolo, Rawle & Henderson, Philadelphia, Pa., for appellee Fruehauf Trailer Operations.

Before MANSMANN, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Bruce W. Buzzard (Buzzard) appeals from an interlocutory order of the United States District Court for the Middle District of Pennsylvania granting summary judgment to Fruehauf Trailer Operations, a division of Terex Trailer Corporation (Fruehauf), on Buzzard's negligence and product liability claims against it. The district court concluded that Buzzard's state common law tort claims were pre-empted by the National Traffic and Motor Vehicle Safety Act (Safety Act or Act), 15 U.S.C.A. §§ 1381–1431 (West 1982 & Supp.1991) and Federal Motor Vehicle Safety Standard 108 (Standard 108) promulgated thereunder, see 49 C.F.R. § 571.108 (1989).[1]

We will reverse and remand. Standard 108 relates to illumination, i.e., required lighting equipment. Unlike Federal Motor Vehicle Safety Standard 208 (Standard 208) which relates to passive restraints, see 49 C.F.R. § 571.208 (1991), the standard we considered in Pokorny v. Ford Motor Co.,

902 F.2d 1116 (3d Cir.), cert. denied, — U.S. ——, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990), Standard 108 does not give manufacturers seeking shelter from the storm of modern product liability lawsuits a choice among several safe harbors. Neither Buzzard's strict liability claim for defective design nor his alternate claim for negligent design make it impossible to comply with both state and federal law. His claims do not actually conflict with federal law nor do they frustrate the primary purpose or objective of the Safety Act, highway safety. Instead, Buzzard's action furthers that purpose. Therefore, Standard 108 does not pre-empt Buzzard's state common law tort action.

### I.

On December 14, 1990, Buzzard filed this survival and wrongful death action in the district court, on behalf of himself, his minor son, Lucas Buzzard, and his deceased wife's estate against Fruehauf, Roadrunner Trucking, Inc. (Roadrunner) and Roy L. Gerst (Gerst). The complaint alleged Fruehauf[2] was either strictly liable as the manufacturer of an unreasonably dangerous product expected to reach consumers, or alternately for negligently designing a flatbed trailer without lighting or reflective devices adequate to warn other motorists of the trailer's size, location and movement. Buzzard sought in excess of fifty thousand ($50,000) dollars in damages, plus interest and costs.

After all defendants had filed answers to the complaint and cross-claims, Fruehauf filed a motion for summary judgment. Fruehauf argued it was entitled to judgment as a matter of law because Buzzard's claims were pre-empted by federal law. The district court concluded that federal law did pre-empt Buzzard's claims against Fruehauf. Accordingly, it issued an order granting Fruehauf's motion for summary judgment and entered judgment for Fruehauf and against Buzzard. Buzzard timely

---

1. This is the version of Standard 108 in effect when the accident in this case occurred. The relevant portions of the current version are identical. See 49 C.F.R. § 571.108 (1991).

2. The other defendants are not parties to this appeal.

appealed from that order. Thereafter, the district court certified the order for appeal pursuant to Federal Rule of Civil Procedure 54(b).

## II.

The facts material to Fruehauf's motion are not in dispute. Buzzard's action arose out of a fatal accident on the night of January 13, 1989 involving his wife, Deborah S. Buzzard, and a tractor pulling a flatbed trailer. Gerst was driving the tractor-trailer. It was owned by his employer, Roadrunner. Mrs. Buzzard had been driving her 1987 Mazda DX south on Pennsylvania Route 209, an unlit four lane highway running in a north-south direction, towards the intersection of Route 209 and Beaver Valley Road, in Hamilton Township, Monroe County, Pennsylvania. At the same time, Gerst was operating a 1987 PBT 400 highway tractor with an attached flatbed trailer. Fruehauf had designed and manufactured the flatbed trailer and sold it to Roadrunner. Buzzard does not contend that the lighting and reflective devices on the trailer failed to comply with the illumination standards set by the Safety Act and Standard 108. The accident occurred when Gerst, apparently attempting to make a "K" turn, backed the tractor-trailer out of Beaver Valley Road and onto Route 209, blocking the entire right southbound lane and part of the left southbound lane of Route 209. Mrs. Buzzard's vehicle collided violently with the right side of the flatbed trailer. She eventually died from the injuries she suffered.

## III.

■ The district court had subject matter jurisdiction over this diversity action pursuant to 28 U.S.C.A. § 1332(a) (West Supp.1991). Generally, an order granting summary judgment as to one of several defendants is not appealable. *See Jackson v. Hart*, 435 F.2d 1293, 1294 (3d Cir.1970). On January 16, 1992, however, the district court amended its order to certify it for immediate appeal under Rule 54(b). Although the appeal was prematurely taken from a non-appealable interlocutory order,

we may consider it as if taken from the district court's subsequent Rule 54(b) certification provided such consideration does not prejudice Fruehauf. *See Richerson v. Jones*, 551 F.2d 918, 922 (3d Cir.1977). No prejudice exists here and indeed Fruehauf does not oppose Buzzard's assertion of appellate jurisdiction. Therefore, we have decided to exercise the appellate jurisdiction 28 U.S.C.A. § 1291 (West Supp.1991) gives us over Buzzard's appeal from the order the district court has certified pursuant to Rule 54(b).

■ We exercise plenary review since this appeal involves the resolution of a pure question of law which arose on a motion for summary judgment below. *International Union, UMW v. Racho Trucking Co.*, 897 F.2d 1248, 1252 (3d Cir.1990).

## IV.

■ The pre-emption doctrine, rooted in the Supremacy Clause of the United States Constitution, U.S. Const., art. VI, cl. 2, requires conflicts between federal and state law to be resolved in favor of federal law. *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Federal regulations, as well as federal statutes, can trigger pre-emption. *Hillsborough County, Fla. v. Automated Medical Lab., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *De La Cuesta*, 458 U.S. at 153, 102 S.Ct. at 3022. Liability in tort imposed under state common law principles is subject to pre-emption under the Supremacy Clause whenever those common law principles conflict with federal statutory or regulatory law. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959); *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181, 186–87 (3d Cir.1986).

Pursuant to the pre-emption doctrine, federal law supersedes state law in three general situations. We explained them in *Pokorny*. There we said:

In *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 [108 S.Ct. 1145, 99 L.Ed.2d

316] (1988), the Supreme Court recognized that federal pre-emption of state law can occur in three types of situations: where Congress explicitly pre-empts state law, where pre-emption is implied because Congress has occupied the entire field and where pre-emption is implied because there is an actual conflict between federal and state law.

A pre-emption question requires an examination of congressional intent. Of course, Congress explicitly may define the extent to which its enactments pre-empt state law. In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of the obligations imposed by it ... reveal the same purposes." Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found " 'when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' "

*Pokorny*, 902 F.2d at 1120 (quoting *Schneidewind*, 485 U.S. at 299–300, 108 S.Ct. at 1150–51 (citations omitted)).

■ The pre-emption doctrine is limited by a presumption that Congress did not intend to displace state law. *See Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981); *Pokorny*, 902 F.2d at 1122; *Cipollone*, 789 F.2d at 185. The burden of demonstrating pre-emption rests with the defendant. *See Silkwood v. Kerr–McGee, Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615,.625, 78 L.Ed.2d 443 (1984).

■ Fruehauf asserts that it is entitled to summary judgment because Buzzard's state common law tort action is pre-empted by the Safety Act and Standard 108 promulgated thereunder.[3] In the Safety Act, Congress does not explicitly set forth an intent to pre-empt state common law tort actions regarding automobile safety. The Safety Act has both a pre-emption clause, section 1392(d),[4] and a savings clause, section 1397(k).[5] *See* 15 U.S.C.A. § 1392(d); *id.* § 1397(k). Considering those clauses together in *Pokorny*, we held that "Congress did not intend all common law tort actions for design defects ... [to] be expressly pre-empted by [federal motor vehicle safety standards]." *Pokorny*, 902 F.2d at 1121. Section 1397(k) specifically states that compliance with federal standards does not exempt persons from common law liability. In *Pokorny*, we refused to construe the savings clause of section 1397(k) so narrowly that it would apply only to common law actions wholly beyond the Safety Act's purview. *See id.* at 1121.[6]

3. Under the Safety Act, the Secretary of Transportation is authorized to promulgate minimum, practical and objective Federal motor vehicle safety standards for motor vehicle and motor vehicle equipment performance in order to achieve the Act's increased automobile safety goal. *See* 15 U.S.C.A. § 1391(2) (West 1982); *id.* § 1392(a) (West 1982).

4. The pre-emption clause provides in relevant part:
Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such ve-

hicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard.
15 U.S.C.A. § 1392(d) (West Supp.1991).

5. The savings clause provides:
Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law.
15 U.S.C.A. § 1397(k) (West Supp.1991).

6. We recognize that a savings clause alone will not serve to allow a state common law action to stand against either explicit or implied pre-emp-

Such a construction would deprive the savings clause of any practical effect. In *Pokorny*, we also held that section 1397(k) shows Congress had no intention of occupying the entire field of motor vehicle safety. *See id.* at 1123 n. 7. Accordingly, we must hold here that the Safety Act and Standard 108 do not pre-empt Buzzard's action, either expressly or impliedly by occupation of the field.

The Safety Act and Standard 108 could, nevertheless, impliedly pre-empt Buzzard's action if Fruehauf demonstrates that Buzzard's products liability or negligence claims for defective design of the trailer's illumination system actually conflict with federal law. In order to determine whether an actual conflict exists, we examine the purpose of the federal law and the effect of common law liability on its purpose. *See Cipollone*, 789 F.2d at 187. Buzzard's common law claims would be in actual conflict with federal law if they prevented Fruehauf from feasibly complying with both federal and state law or frustrated the purpose of the Safety Act and Standard 108.

Actual conflict and subversion of federal purpose are not to be lightly implied, lest we lose the benefits of legal development and adaptation to changing conditions in accordance with the principles of the common law. Additionally, our federal system imposes on us obligations both to respect the role reserved to the states and yet preserve the federal power in accord with Congressional intent. *See Pokorny*, 902 F.2d at 1123.

In *Pokorny*, John Duffy (Duffy) died in a traffic accident while a passenger in a Ford van. *Id.* at 1117. At the time of the accident, Duffy was not wearing the manual seat belt Ford Motor Company (Ford) had installed in the van. Ann Duffy Pokorny, administratrix of the estate of Duffy, sued Ford contending that Ford's failure to equip the van with air bags, automatic seat belts or protective netting on the windows that would be apt to prevent fatal injuries

like those Duffy suffered was a design defect that subjected Ford to liability both in negligence and as the maker of a defective product. *Id.* The district court granted summary judgment in favor of Ford holding that Pokorny's state common law tort action was pre-empted by the Safety Act and Standard 208, 49 C.F.R. § 571.208. *Id.* at 1118.

The version of Standard 208 in effect when the 1981 Ford van was manufactured required automobile manufacturers to provide one of three types of occupant restraint systems: air bags, automatic seat belts or manual seat belts. *See id.* at 1119 n. 3 (citing 49 C.F.R. '§ 571.208, S4.1.2 (1980)). We held that a common law tort action for defective design based on Ford's decision not to install air bags or automatic seat belts, but instead to choose the third option for passenger restraint systems that Standard 208 allowed, manual seat belts, was preempted because it did actually conflict with the Safety Act and Standard 208. *Id.* at 1123. We therefore affirmed this aspect of the district court's judgment. *Id.* at 1125. We also held, however, that neither the Safety Act nor Standard 208 preempted common law product liability claims based on a failure to include other types of passive restraints in vehicle design such as protective window netting. We reversed this aspect of the district court's judgment and remanded on the question whether Ford's failure to equip its van with passenger protective devices like window netting was a design defect actionable under Pennsylvania law. *Id.* at 1126.

In finding an actual conflict between Pokorny's claim of a design defect by reason of Ford's failure to install air bags or automatic seat belts and Standard 208, we first considered Congress' "primary goal" in enacting the Safety Act. In 15 U.S.C.A. § 1381, Congress declared the purpose of the Act as follows: "to reduce traffic accidents and deaths and injuries to persons

tion. A savings clause like section 1397(k) does not preserve state common law actions that subvert federal law. *See International Paper Co.*

*v. Ouellette*, 479 U.S. 481, 492–94, 107 S.Ct. 805, 811–13, 93 L.Ed.2d 883 (1987), *quoted in Pokorny*, 902 F.2d at 1125.

resulting from traffic accidents." [7] Indeed, Congress's primary purpose in enacting the Safety Act is expressed in its title.[8] We also reasoned that the inclusion of section 1397(k) in the Act evidences Congress's belief that common law tort liability would advance this goal. *Id.* These conclusions have longstanding support in case law. In *Larsen v. General Motors Corp.*, 391 F.2d 495, 506 (8th Cir.1968), one of the earliest published decisions interpreting the Safety Act, the United States Court of Appeals for the Eighth Circuit held the Act was intended to supplement negligence and product liability law. It viewed the Act as a step towards developing standards for the duty of reasonable care which would meet the needs of modern motorists in conjunction with the common law, not as an exemption from common law liability. *Id.*

Our finding of an actual conflict in *Pokorny* between Standard 208 and a common law action for design defect based on the absence of an air bag was based on the specific intent behind and the particular purpose of the special option provision of Standard 208 with respect to three particu-

lar kinds of passive restraints. *Pokorny*, 902 F.2d at 1122–23; *accord Pennsylvania Medical Soc'y v. Marconis*, 942 F.2d 842, 854–55 (3d Cir.1991). We held that Standard 208 had the specific purpose of giving automobile manufacturers a choice among three passenger restraint systems without being subject to liability for choosing one of those three passive restraint systems over another that some persons might think better reduce the risk of injury to the occupants of motor vehicles. *Pokorny*, 902 F.2d at 1123. We relied on section 1410b of the Safety Act and its peculiar legislative history. *See* 15 U.S.C.A. § 1410b (West 1982).

The legislative history specific to section 1410b shows that Congress enacted that section in response to a controversy over proposed passive restraint requirements. *Pokorny*, 902 F.2d at 1123 (citing H.R.Rep. No. 1191, 93rd Cong., 2d Sess. 28–30 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6046, 6073–75; Conf.Rep. No. 1452, 93rd Cong., 2d Sess. 25 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6084, 6108). Congress's concern was that certain types of passive safe-

---

**7.** Evidence that highway safety was Congress's primary goal is found in the Safety Act's legislative history. The Report of the Senate Commerce Committee begins by noting a compelling need for strong motor vehicle safety legislation, and stating the Committee's desire to assure safer motor vehicle standards in order to reduce "the soaring rate of death and debilitation on the Nation's highways." Senate Comm. on Commerce, National Traffic and Motor Vehicle Safety Act of 1966, S.Rep. No. 1301, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2709 [hereinafter S.Rep. No. 1301]. The Report continues: "safety shall be the overriding consideration in issuance of standards under this bill." *Id.* at 2714. A House Conference Committee Report describes the bill as intended "to provide for a coordinated national safety program and establishment of safety standards for motor vehicles in interstate commerce to reduce accidents involving motor vehicles and to reduce the deaths and injuries occurring in such accidents." Statement of the Managers on the Part of The House, National Traffic and Motor Vehicle Safety Act of 1966, Conf.Rep. No. 1919, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.C.C.A.N. 2731, 2731.

**8.** *Pokorny* recognized that Congress was also concerned with promoting uniformity in safety standards promulgated under the Act. *.Pokorny*, 902 F.2d at 1122. We stated that section 1392(d)'s textual prohibition of state standards

not identical to federal standards, along with a statement in the Act's legislative history that safety standards should be not only strong and enforced, but also uniform, evidenced this secondary concern. *Id.* (citing S.Rep. No. 1301, 1966 U.S.C.C.A.N. at 2720). Although the language of the report indicates a Congressional intent to foster uniformity, it also states: "The States are also permitted to set more stringent requirements for purposes of their own procurement. Moreover, the federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law." S.Rep. No. 1301, 1966 U.S.C.C.A.N. at 2720. This latter statement gives support to our conclusion that safety, encouraged by federal law or state tort liability, is the primary concern of the Act and so takes precedence over uniformity. We were thus unwilling in *Pokorny* to accept a broad notion of pre-emption based on uniformity because pre-emption on that basis would undermine Congress's primary goal of promoting safety. *Pokorny* 902 F.2d at 1122; *see also Chrysler Corp. v. Tofany*, 419 F.2d 499, 511 (2d Cir.1969) (while uniformity is desirable, it is a secondary objective because "the express purpose of the [Safety Act] is the reduction of traffic accidents").

ty systems, *viz.*, air bags and automatic seat belts, would become prematurely mandatory. *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34–37, 103 S.Ct. 2856, 2862–64, 77 L.Ed.2d 443 (1983)). Section 1410b preserved the option of manual seat belts for passenger restraint systems. *Id.* at 1124. The regulatory history of Standard 208 shows that the Department of Transportation, consistent with Congress's intent expressed in section 1410b, rejected all idea of mandating either air bags or automatic seat belts and instead preserved the option of manual seat belts. *Id.* We held that an action asserting liability for choosing one of the three passive restraint options section 1410b and Standard 208 named instead of another would frustrate the regulatory framework and undermine the flexibility that Congress and the Department of Transportation intended to give to manufacturers in deciding whether to include air bags, automatic or manual seat belts in their design. *Id.* We said:

> Because common law liability for failing to provide passenger-side air bags or automatic seat belts would undermine the option of meeting federal safety standards by providing a manual seat belt system like that in the Ford van in which Duffy was killed, an option that Congress and the Department of Transportation clearly intended to preserve, Pokorny's action is pre-empted to the extent that it is based on this theory of recovery.

*Id.* at 1125.

As stated above, however, we also held that Pokorny's state tort action against Ford was not pre-empted insofar as it asserted that the vehicle was defectively designed because it did not include protective netting over its windows, a passive restraint system not listed as an option in Standard 208. *Id.* at 1126. We held that potential liability for failure to include that type of passive restraint system, unlike a failure to include air bags or automatic seat belts, does not actually conflict with the Safety Act or with Standard 208's regulatory framework. *Id.* A tort action based on a failure to include other systems

"[would] not take away the flexibility established by the federal scheme, and it [would] not have the effect of prohibiting an option granted by Congress or the Department of Transportation." *Id.* We reasoned that common law liability for other design defects simply would "encourage" automobile manufacturers to employ safety features additional to those listed in Standard 208 and was thus consistent with Congress's primary safety goal. *Id.* We wrote: "We do not think that Congress or the Department of Transportation intended to 'freeze' motor vehicle safety design with either the Safety Act or Standard 208." *Id.* A conclusion that the Safety Act pre-empted claims for failure to include the additional passive restraint system of protective window netting would create such an undesirable effect; therefore, we hold to the contrary. *Id.*

■ For similar reasons, we hold here that Buzzard's action for defective design of the illumination system on the Fruehauf trailer involved in Mrs. Buzzard's fatal accident does not actually conflict with the Safety Act or Standard 108. Success on Buzzard's claim against Fruehauf does not necessarily make it impossible to comply with both federal and state law or frustrate the primary purpose and objective of the Safety Act.

Fruehauf argues, however, that Buzzard's state common law action is nevertheless pre-empted because it would frustrate the Act's uniformity goal. We are unconvinced. It remains our view, as it was in *Pokorny*, that uniformity was merely a secondary concern to Congress when it enacted the Safety Act. Accordingly, uniformity cannot take precedence over Congress's primary goal of safety, nor can it defeat Congress's intent, as set out in section 1397(k) of the Act, to permit state common law to develop more stringent design requirements in the interest of increased safety. Strict uniformity may even interfere with the safety goal, thus frustrating the Act's purpose. Because of the differences in geography and population among the states, varying standards and requirements may be necessary to

achieve the same level of safety in different states. *See Tofany*, 419 F.2d at 511. The common law development of those standards is properly left to the courts of those states. Therefore, even though state common law may have some negative effect on uniformity, it is not pre-empted.[9]

Our holding that Standard 108 does not pre-empt all common law claims based on defective design of a vehicle's lighting system should not be construed too broadly. The stated purpose of Standard 108 is to:

reduce traffic accidents and deaths and injuries resulting from traffic accidents, by providing adequate illumination of the roadway, and by enhancing the conspicuity of motor vehicles on the public roads so that their presence is perceived and their signals understood, both in daylight and in darkness or other conditions of reduced visibility.

49 C.F.R. § 571.108, S2. In order to accomplish this purpose, Standard 108 describes in detail the illumination equipment required to reach the necessary level of conspicuity. Buzzard has alleged Fruehauf's trailer was defectively designed because Fruehauf failed to install adequate rear and side lights, reflectors or reflective tape, and other devices in addition to those required by Standard 108 which would increase motorist ability to identify the trailer in the dark in time to avoid underride accidents.[10] Two sections of Standard 108 are of particular importance in this case. One provides in relevant part:

[Reflective tape] ... may be used for side reflex reflectors if this material as used on the vehicle, meets the performance standards....

*Id.* at S5.1.1.4. The other provides:

No additional lamp, reflective device or other motor vehicle equipment shall be installed that impairs the effectiveness of lighting equipment required by this Standard.

*Id.* at S5.1.3.

The language and purpose of Standard 108 leave the door open for states to require, through judge-made common law, additional illumination equipment that would enhance conspicuity. This is evident through Standard 108's express permission for the use of tape and other illumination equipment. It does not permit states to impose lighting requirements that would interfere with the illumination given by the equipment Standard 108 requires.[11] Nevertheless, Standard 108's textual invitation for additional equipment that might enhance conspicuity strongly supports our conclusion that the Act and Standard 108 do not wholly preclude a state court from ruling Fruehauf's failure to include additional illumination equipment that would further the Safety Act's prime purpose of safety was a design defect for which Fruehauf would be liable under the common law. In *Swope v. STI Transit Co.*, No. 90–6936, 1992 WL 7337 (E.D.Pa. Jan. 13, 1992),

9. Fruehauf contends that the impact of differing state standards for vehicle illumination on interstate commerce requires pre-emption. Analytically, that argument is based on the dormant commerce clause, not pre-emption. Fruehauf has not framed its argument in that context but has only argued pre-emption. Under the dormant commerce clause, only state actions that purposefully or arbitrarily undermine uniformity in areas of federal importance are unconstitutional. *See Juzwin v. Asbestos Corp.*, 900 F.2d 686, 689 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990). Thus, even if Fruehauf had framed its argument in terms of the dormant commerce clause, it would not have been successful. Though there are numerous cases holding state legislative action invalid under the dormant commerce clause, we have found none invalidating liability founded on principles of state common law. A holding that Pennsylvania's common law impos-

ing liability for design defects that cause highway accidents was an undue burden on interstate commerce would be in direct conflict with the intent Congress expressed in section 1397(k) to preserve state common law remedies in furtherance of its primary goal of increasing highway safety.

10. It is not yet known exactly what equipment Buzzard will assert Fruehauf should have used to comply with state common law. Discovery with regard to conspicuity equipment was not completed when the district court granted summary judgment to Fruehauf on grounds of pre-emption.

11. Therefore, whatever equipment Buzzard asserts Fruehauf should have used, he must show it does not reduce the effectiveness of the equipment Standard 108 requires.

the United States District Court for the Eastern District of Pennsylvania · considered the same issue we consider here, and held that the ban on additional equipment that would render the required equipment less effective, *see* 49 C.F.R. § 571.-108, S5.1.3, does not lead to a conclusion that all additional equipment is banned. If it did, the court reasoned, then the last eleven words of S5.1.3 of Standard 108 would be meaningless. The court further reasoned that it is not self-evident that all additional devices would render the required equipment less effective. We agree. *See id.* at *2–3.

In the same way that common law actions for failure to install passenger restraint systems additional to those options listed in Standard 208 could encourage increased safety, *see Pokorny*, 902 F.2d at 1126, Buzzard's action could encourage increased safety by enhancing motorists' ability to take in at a glance the size, location and movement of tractor-trailers encountered at night on the public highways. Encouraging manufacturers to act in a way that increases safety does not frustrate the primary purpose of the Safety Act. Nor does it make it impossible to comply with both federal and state law, as it does not suggest that illumination equipment mandated by state common law be used *instead* of that required by federal law, but only *in addition* to that specified in Standard 108. To the extent Buzzard can show there is other equipment that increases conspicuity without reducing the effect of the required equipment, his action does not actually conflict with the Safety Act or Standard 108.[12] So limited, actions like Buzzard's aid the development of feasible lighting systems that improve on the illumination provided by compliance with Standard 108 and thereby aid federal law in developing illumination design standards to meet the needs of modern motorists. *See Larsen*, 391 F.2d at 506.

Fruehauf misconceives *Pokorny* when it argues that any limitation of an automobile manufacturer's option to choose among the three particular passive restraint options listed in Standard 208 actually conflicted with Standard 208 and section 1410b of the Act is dispositive of this case concerning the pre-emptive effect of Standard 108 on minimum illumination requirements. Standard 108 does not give trailer manufacturers an option analogous to that accorded by Standard 208 and section 1410b of the Act with respect to particular passive restraints.

The options in Standard 208 are "essential" to that regulation. The choice in Standard 108 is not. The Standard 208 option gives manufacturers the flexibility to choose among three restraint systems, each which achieve restraint in varying degrees. Standard 108 merely gives manufacturer's a choice among materials all calculated to achieve the same degree of illumination. The level of choice in Standard 108 does not rise to the level of option in Standard 208. *See Swope* at *3. Standard 108, unlike Standard 208, requires manufacturers to achieve a minimum level of conspicuity but does not preclude state common law from requiring a higher level. Buzzard seeks to impose liability on Fruehauf for its failure to adopt a feasible design that increases the minimum level of conspicuity Standard 108 requires. Neither Standard 108 nor section 1392(b) demonstrate textually or by legislative history a Congressional intent to absolve trailer manufacturers from higher state common law standards on illumination systems. The fact that actions for failure to include air bags or automatic seat belts are pre-empted by the Safety Act and Standard 208 is not dispositive of Buzzard's claim.

We are not persuaded by the reasoning of the court in *Crowe v. Fleming*, 749 F.Supp. 1135 (S.D.Ga.1990), the case on which Fruehauf chiefly relies. There, the district court determined cases holding that claims for defective design based on failure to install air bags are pre-empted by Standard 208 and the Safety Act were dispositive with respect to a claim based on failure

---

**12.** Of course, whether he will be able to do so cannot be determined at this early stage of these proceedings.

to use reflective tape and thus held that claim was pre-empted by Standard 108 and the Safety Act. *Id.* at 1139–41. The *Crowe* court reasoned that Standard 108 gave manufacturers an option between tape and lamps similar to that given in Standard 208 among air bags, automatic seat belts and manual seat belts. We disagree. Based on our own holding in *Pokorny* that an action for failure to install netting was not pre-empted and the persuasive reasoning of the district court in *Swope*, we decline to follow *Crowe*.

In summary, we hold Buzzard's action does not necessarily pose an actual conflict with the Safety Act or Standard 108. Such a conflict depends upon the type of additional equipment that Buzzard can demonstrate Fruehauf should have used and whether that equipment would provide greater conspicuity without interfering with the effectiveness of Standard 108's required equipment. Therefore, the district court prematurely granted Fruehauf summary judgment before Buzzard had a chance to show that Fruehauf's lighting system could have been designed to provide better illumination than that required in Standard 108 and that Fruehauf's failure to do so was a legal cause of the accident that killed his wife. Fruehauf retains the burden of showing actual conflict for pre-emption purposes.

## V.

Because Fruehauf has not demonstrated, at this stage of the litigation, that it is entitled to summary judgment on the basis of pre-emption, we will vacate the district court's order granting Fruehauf's motion for summary judgment and remand the matter to the district court for further proceedings consistent with this opinion.

