**GREAT DANE TRAILERS, INC., Petitioner,**

v.

**ESTATE OF Garland Fredderick WELLS, deceased, Sametrius Wells, individually and as next friend of D. W., a minor child, and as administratrix of The Estate of Garland Fredderick Wells, Respondent.**

No. 00–0022.

Supreme Court of Texas.

Argued on Jan. 10, 2001.

Decided June 14, 2001.

---

4. *Stevenson*, 27 S.W.3d at 203.

5. 928 S.W.2d 96, 97 (Tex.App.—San Antonio 1996, no writ).

6. *Stevenson*, 27 S.W.3d at 202.

Robert M. Schick, Demetrios Anaipakos, Catherine B. Smith, Vinson & Elkins, Houston, for Petitioner.

Thomas K. Brown, Fisher, Boyd, Brown, Boudreaux & Huguenard, Houston, for Respondent.

Justice BAKER delivered the opinion of the Court.

The issue in the case is whether the plaintiffs' state common-law tort claims are impliedly preempted because they conflict with the National Traffic and Motor Vehicle Safety Act and Federal Motor Vehicle Safety Standard 108. Without specifying the ground, the trial court granted the defendant's summary-judgment motion, which alleged both express and implied preemption. The court of appeals, relying on this Court's opinion in *Hyundai Motor Co. v. Alvarado,* 974 S.W.2d 1 (Tex.1998), determined that the plaintiffs' tort claims were neither expressly nor impliedly preempted. 5 S.W.3d 860, 865–68. The court of appeals reversed and remanded the cause to the trial court for further proceedings. 5 S.W.3d at 868. We agree with the court of appeals that the plaintiffs' claims are neither expressly nor impliedly preempted. Accordingly, we affirm the court of appeals' judgment.

## I. BACKGROUND

In October 1990, Garland Fredderick Wells was killed in a nighttime automobile accident. An eighteen-wheel tractor-trailer rig traveling immediately in front of him jackknifed and collided with an oncoming van. Wells' car struck the trailer's side. Wells' wife, Sametrius Wells, and his child were traveling with him and were injured in the accident.

Great Dane Trailers manufactured the platform trailer in 1986. At that time, Standard 108 required a three-light, three-reflector configuration on each side of the trailer. Great Dane equipped its trailers with these required lights and reflectors. Specifically, each side of the trailer had one red reflex reflector and red side-marker light near the rear, one amber reflex reflector and amber side-marker light near the front, and one amber reflex reflector

and amber side-marker light near the middle.

Semetrius Wells, on her behalf, as her son's next friend, and as adminstratrix of her husband's estate, sued several defendants including Great Dane. They sought personal-injury damages as well as wrongful-death and survival damages based on negligence and products-liability theories. Initially, the Wellses alleged that Great Dane's trailer was defectively manufactured, designed, or marketed because it lacked a lateral guard, allowing Wells' car to penetrate under the trailer. After all Great Dane's co-defendants settled with the Wellses, the Wellses amended their petition and deleted the original allegations about the lateral guard's absence. Instead, they pleaded that Great Dane's trailer was defectively manufactured, designed, or marketed because it was not equipped with "reasonable or necessary conspicuity devices." In discovery responses, the Wellses claimed that the Great Dane trailer was unreasonably dangerous "because of an insufficiency of reflected [sic] material, lighting and other safety material which would have served to alert drivers...." In sum, the Wellses alleged that Great Dane had a duty to add additional lights or reflectors to its trailer to make it more conspicuous at night.

Great Dane moved for summary judgment, asserting that the Safety Act and Standard 108 expressly and impliedly preempted the Wellses' common-law conspicuity claims. Great Dane's summary-judgment evidence showed that its trailer fully complied with Standard 108's requirements when Great Dane manufactured it and when it left Great Dane's possession. In response, the Wellses conceded that Great Dane's trailer fully complied with Standard 108. But they nevertheless contended that Great Dane should have increased the trailer's conspicuity; that is, Great Dane's trailer should have had additional lights or reflectors.

The trial court granted Great Dane's summary-judgment motion and dismissed the Wellses' claims. While the Wellses' appeal was pending in the court of appeals, this Court decided *Alvarado*. *Alvarado*, 974 S.W.2d at 13 (holding that the Safety Act did not expressly or impliedly preempt a tort claim based on the manufacturer's failure to install lap belts). Relying on *Alvarado*, the court of appeals held that the Wellses' claims were neither expressly nor impliedly preempted. 5 S.W.3d at 865–68. The court of appeals recognized that the Safety Act had not pervasively regulated the entire field of vehicle safety. 5 S.W.3d at 866. And it determined that it was not impossible for Great Dane to comply with federal law, and, at the same time, to respond in damages for breaching alleged common-law duties. 5 S.W.3d at 866. Finally, the court of appeals held that the Wellses' claims were not an obstacle to executing and adhering to congressional purposes and objectives. 5 S.W.3d at 867–68.

In February 2000, Great Dane petitioned this Court to review the court of appeals' judgment. Great Dane presented two questions:

1. Should this Court correct and reverse its opinion in *Alvarado* to acknowledge what countless other courts have concluded: the Safety Act expressly and impliedly preempts common-law safety standards, not identical to those specified by the Safety Act?

2. Even if this Court is unwilling to correct and reverse its opinion in *Alvarado*, did the court of appeals err when it relied on *Alvarado* to conclude, without discussion, that Standard 108, a safety standard neither analyzed nor mentioned in *Alvarado*, did not impliedly

preempt respondent's common-law claims?

In May 2000, while this appeal was pending, the United States Supreme Court decided *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). In *Geier*, the plaintiffs claimed that a passenger-car manufacturer was liable because it did not equip its 1987 vehicles with airbags. At the time, Standard 208 required car manufacturers to equip some, but not all, 1987 vehicles with passive restraints. The Supreme Court construed the Safety Act's preemption clause and saving clause together, unanimously concluding that the Safety Act does not expressly preempt "nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard." *Geier*, 529 U.S. at 868, 120 S.Ct. 1913; *see also Geier*, 529 U.S. at 898, 120 S.Ct. 1913 (Stevens, J., dissenting).

But the Supreme Court also held that Standard 208 impliedly preempted the *Geier* plaintiffs' claims because those common-law claims conflicted with Standard 208. The Court observed that preemption based on conflict is different from an agency's express statement about preemptive intent because conflict preemption turns on identifying an actual conflict and not on an express statement. *Geier*, 529 U.S. at 884, 120 S.Ct. 1913; *see also English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Additionally, the Court noted that while preemption fundamentally is a question of congressional intent, courts traditionally distinguish between express and implied preemptive intent and treat conflict preemption as implied preemption. *Geier*, 529 U.S. at 884, 120 S.Ct. 1913; *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *English*, 496 U.S. at .78–79, 110 S.Ct. 2270.

After reviewing Standard 208's history, the *Geier* Court concluded that Standard 208 reflects the Secretary's policy that safety would be best promoted if manufacturers installed *alternative* passive-restraint systems in their cars rather than one particular system in every car. *Geier*, 529 U.S. at 881, 120 S.Ct. 1913. On the other hand, the Court noted, the *Geier* plaintiffs' common-law claims were based on the presumption that all cars had to have air bags even if they had some other passive-restraint device. *Geier*, 529 U.S. at 881, 120 S.Ct. 1913. Thus, the common-law claims presented an obstacle to manufacturers using the variety and mix of passive-restraint devices that Standard 208 sought to promote and an obstacle to the gradual passive restraint phase-in that Standard 208 deliberately imposed. *Geier*, 529 U.S. at 881, 120 S.Ct. 1913. Accordingly, the Court held that the Safety Act and Standard 208 impliedly preempted the *Geier* plaintiffs' common-law claims because they "stood 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives." *Geier*, 529 U.S. at 881, 120 S.Ct. 1913 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

Following *Geier*, this Court requested full briefing from the parties. Great Dane conceded that *Geier* precludes our holding that the Safety Act and Standard 108 expressly preempt nonidentical state common-law standards established in tort actions covering the same performance aspect as an applicable federal standard. Thus, on the merits, Great Dane reframed the issue as:

> Are the Wellses' state common-law tort claims impliedly preempted because they conflict with the Safety Act and Standard 108?

We granted Great Dane's petition to apply *Geier's* implied-preemption analysis to this issue.

## II. APPLICABLE LAW

### A. STATUTORY OVERVIEW

In 1966, Congress enacted the Safety Act, implemented under the National Highway Traffic Safety Administration's authority. The Safety Act's explicit purpose is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (recodified at 49 U.S.C. § 30101).[1] To accomplish this purpose, Congress empowered the Secretary of Transportation to adopt motor vehicle safety standards. 15 U.S.C. § 1392(a) (recodified at 49 U.S.C. § 30111(a)). These standards must be "reasonable, practicable and appropriate." *See* 15 U.S.C. § 1392(f)(3) (recodified at 49 U.S.C. § 30111(b)(3)). Additionally, the standards must meet the need for motor vehicle safety and be stated in objective terms. *See* 15 U.S.C. § 1392(a) (recodified at 49 U.S.C. § 30111(a)). The standards the Secretary adopts under the Safety Act are, fundamentally, performance requirements, not design requirements. *See Perry v. Mercedes Benz, Inc.*, 957 F.2d 1257, 1260 (5th Cir.1992). In fact, the Safety Act's legislative history states:

> [T]he new and revised standards are expected to be performance standards, specifying the required minimum safe performance of vehicles but not the manner in which the manufacturer is to achieve the specified performance.... The Secretary would thus be concerned with the measurable performance of a ... system but not its design details.

S.REP. No. 89–1301, at 4 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2712.

Under Texas law, a manufacturer is liable in a products-liability action only if the product was defective when it was manufactured and left the manufacturer's control. *See Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex.1996) (citing RESTATEMENT (SECOND) OF TORTS § 402A (1965)). Therefore, the standards in effect when Great Dane manufactured and sold the trailer in 1986 are the relevant standards.

In conformity with the Safety Act, the Secretary adopted Standard 108, which specifies requirements for original and replacement lamps, reflective devices, and associated equipment. *See* 49 C.F.R. § 571.108, S1 (1986). Standard 108's stated purpose in specifying conspicuity requirements was to ensure vehicles had the "equipment necessary for signaling and for the safe operation of motor vehicles during darkness and other conditions of reduced visibility." 49 C.F.R. § 571.108, S1 (1986). To accomplish this purpose, Standard 108 described in detail the illumination equipment required to reach the necessary level of conspicuity-a three-light and three-reflector configuration on each trailer side. *See* 49 C.F.R. § 571.108, S4 (1986). Two sections of Standard 108 particularly relevant to this appeal provide:

> [Reflective tape] ... may be used for side reflex reflectors if this material as used on the vehicle, meets the performance standards....

49 C.F.R. § 571.108, S4.1.1.4 (1986).

> No additional lamp, reflective device, or other motor vehicle equipment shall be

---

1. The Safety Act was initially codified in chapter 15 of the United States Code, but in 1994 it was recodified in chapter 49. *See* Pub.L. No. 103–272, 108 Stat. 745 (1994) (recodified at 49 U.S.C. §§ 30101–30169).

Although the recodification did not substantively change the Safety Act, the court of appeals and parties have referred to the pre 1994 statute, and, in the interest of consistency, we do the same.

installed that impairs the effectiveness of lighting equipment required by this standard.

49 C.F.R. § 571.108, S4.1.3 (1986).

## B. PREEMPTION

■■■ The laws of the United States are the "supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. If a state law conflicts with federal law, it is preempted and has no effect. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). A federal law may expressly preempt state law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Additionally, federal law or regulations may impliedly preempt state law or regulations if the statute's scope indicates that Congress intended federal law or regulations to occupy the field exclusively or if state law actually conflicts with federal law or regulations. *Myrick*, 514 U.S. at 287, 115 S.Ct. 1483; *Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 247–48 (Tex.1994). State law presents an actual conflict with federal law when: (1) it is impossible for a private party to comply with both state and federal requirements; or (2) state law obstructs accomplishing and executing Congress' full purposes and objectives. *See Myrick*, 514 U.S. at 287, 115 S.Ct. 1483 (citing *English*, 496 U.S. at 79, 110 S.Ct. 2270 and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

■■■ The United States Supreme Court limits the preemption doctrine by presuming that Congress did not intend to displace state law. *See Maryland*, 451 U.S. at 746, 101 S.Ct. 2114; *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Historically, states have exercised primary authority in matters involving their citizens' public health and safety. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Thus, this presumption is nowhere stronger than under circumstances in which the states are exercising that authority. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718–19, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Common-law actions based upon negligence and products liability involve the state's power to regulate health and safety matters. *See Moore*, 889 S.W.2d at 249. Accordingly, the party urging preemption has the difficult burden of overcoming the presumption against preemption. *See Silkwood v. Kerr McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (stating that the party urging preemption has the burden of proof).

## III. ANALYSIS

As we have noted, the parties agree that *Geier* forecloses express preemption under Standard 108. Thus, we need determine only whether the Safety Act and Standard 108 impliedly preempt the Wellses' state tort claims.

## A. THE PARTIES' CONTENTIONS

Great Dane has two basic contentions. First, Great Dane argues that the same analysis the *Geier* Court applied to conclude that the Safety Act and Standard 208 impliedly preempted the tort claims applies in this case. Great Dane contends that allowing the Wellses to pursue their state tort claims interferes with the Secretary's objective in adopting Standard 108. This objective, Great Dane notes, was to develop the optimum conspicuity system and to gradually phase-in that system, thereby accomplishing the Safety Act's goal of reducing traffic accidents. Second, Great Dane argues that the Wellses' state

tort claims are preempted because these claims are diametrically opposed to Standard 108's purpose of uniformity.

In response, the Wellses contend that implied preemption is case specific, and because *Geier* considered implied preemption of a different common-law claim under a different Safety Act standard, the *Geier* Court's finding an actual conflict does not compel the same result here. *See Geier*, 529 U.S. at 874, 120 S.Ct. 1913 (stating that a court should apply ordinary preemption principles to Safety Act cases). The Wellses argue that under the traditional implied-preemption principles recognized in *Geier*, a common-law claim is only impliedly preempted when an actual conflict exists between the common-law claim and the federal regulation at issue. *See Myrick*, 514 U.S. at 287, 115 S.Ct. 1483. And here, the Wellses urge, it is not impossible for Great Dane to comply with both Standard 108 and the common-law duty they allege, which is that Great Dane should have supplemented the minimum equipment requirements.

Furthermore, the Wellses argue that their tort claims do not obstruct congressional objectives. They disagree with Great Dane's assertion that uniform trailer marking is Standard 108's primary purpose. Rather, they argue, the standard's text, the standard's history, and most cases examining this issue demonstrate that reducing accidents is Standard 108's primary goal. The Wellses thus conclude that strict uniformity is not a barrier to manufacturer-initiated improvements to the minimum conspicuity requirements.

### B. Standard 108 does not impliedly preempt the Wellses' common-law claims

We agree with the Wellses that we must analyze their common-law claims, the Safety Act, and Standard 108 under traditional preemption principles. *See Geier*, 529 U.S. at 874, 120 S.Ct. 1913. And, after applying these principles, we conclude that the Safety Act and Standard 108 do not impliedly preempt the Wellses' common-law conspicuity claims.

Great Dane bases its two arguments for implied preemption solely on conflict-preemption principles. Thus, Great Dane must persuade us that allowing the Wellses to proceed with their common-law claims would actually conflict with the Safety Act or Standard 108. *See Myrick*, 514 U.S. at 287, 115 S.Ct. 1483. It can prove an actual conflict by showing that it is impossible for it to comply with both state and federal requirements or that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Myrick*, 514 U.S. at 287, 115 S.Ct. 1483 (citing *English*, 496 U.S. at 79, 110 S.Ct. 2270 and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

### 1. No Conflict With The Secretary's Objectives

 Great Dane's first argument is that, under *Geier's* analytical framework, it is clear that the Wellses' state tort claims conflict with the Secretary's "means-related federal objectives" in promulgating Standard 108. *See Geier*, 529 U.S. at 881, 120 S.Ct. 1913. Here, Great Dane observes, the Secretary studied trailer conspicuity markings for more than ten years, sought comments on the effectiveness of alternate colors, patterns, and materials, and sought other information on the costs, durability, and maintenance of alternate conspicuity enhancements. In doing this, Great Dane contends, the Secretary had three objectives: (1) to develop data on the comparative effectiveness of different lighting and reflective systems, (2) to allow manufacturers to overcome technical prob-

lems, and (3) to achieve consumer recognition and acceptance of conspicuity enhancements.

The Secretary ultimately required a gradual phase-in, mandating additional reflectors on all trailers manufactured on or after 1993, and, beginning in 1999, requiring that all older trailers be retrofitted with additional reflectors over a defined timetable. Thus, Great Dane asserts, this case is similar to *Geier* in which the Court, in finding implied preemption, relied partly on the Secretary's express policy judgment that safety would be promoted by allowing manufacturers to use alternative restraint devices in their cars, rather than one particular passive-restraint system. *See Geier*, 529 U.S. at 881, 120 S.Ct. 1913.

We disagree that *Geier* requires our determining that the Wellses' common-law claims conflict with the Secretary's goals in promulgating the 1986 Standard 108. Rather, we conclude that the Wellses' proposed common-law conspicuity standard does not actually conflict with Standard 108 or the Secretary's objectives in adopting Standard 108. *See* 49 C.F.R. § 571.108, S4.1.1 (1986) ("[E]ach vehicle shall be equipped with *at least* the number of lamps, reflective devices, and associated equipment specified . . . ." (emphasis added)). Unlike Standard 208 in *Geier*, which permitted alternative passive-restraint device standards, Standard 108 establishes only minimum conspicuity standards that states are free to strengthen through tort law. Moreover, the Secretary's extensive studies in the 1970s and the 1980s to collect data about ways to improve trailer conspicuity demonstrate the Secretary's desire to learn about more effective conspicuity markings and configurations than the existing minimum standards. *See* 45 Fed. Reg. 35405, 35406 (1980). In 1987, the Secretary concluded that further study was needed before amending Standard

108, and thus, the Secretary sought manufacturers' comments about their experiences with other reflective materials and sought additional information about various viewing angles, colors, and patterns. *See* 52 Fed.Reg. 35345, 35346 (1987). It was not until 1992 that the Secretary published its final rule amending Standard 108 to require that all trailers manufactured after December 1993 provide a specific reflective pattern. *See* 57 Fed.Reg. 58406, 58413 (1992) (codified at 49 C.F.R. 571.108, S5.7). And, finally, it was not until March 1999 that the Secretary required all trailers manufactured before December 1993 to be retrofitted to comply with the amended Standard 108. *See* 64 Fed.Reg. 15588, 15605 (1999); 49 C.F.R. § 393.13(b) (1999). Thus, it is difficult to envision how a heightened common-law conspicuity requirement in 1986 would have conflicted with the Secretary's goal at that time to improve conspicuity markings and configurations.

Furthermore, relying on the Secretary's studies from 1967 to 1975, and from 1980 to 1991, to improve Standard 108, Great Dane contends that inconsistent standards for reflectivity would have impeded the Secretary's review of its regulations. Specifically, Great Dane contends that there would have been a conflict with federal policy favoring safety if Texas common-law required additional reflective materials on trailers in 1986 because the Secretary would not have had the necessary baseline data to determine the effectiveness of the alternate designs under consideration.

But Great Dane does not persuade us. Under its approach, implied preemption would occur any time the Secretary studied its regulations' effectiveness. We do not see how recognizing the Wellses' common-law claims would "actually conflict" with the agency's ability to study safety-equipment performance. Moreover, im-

plied-preemption analysis only rejects state tort claims that stand as an obstacle to the Secretary's objectives in its studies. *See Geier,* 529 U.S. at 881, 120 S.Ct. 1913. Here, heightened common-law conspicuity requirements would not have impeded the Secretary's objective in its studies to gather as much information as possible to discover different and better conspicuity markings and configurations than the minimum standards. Thus, we conclude the Wellses' proposed common-law standard would not interfere with Standard 108's safety goals.

Great Dane also argues that even if state tort law is consistent with federal goals, the Wellses' claims are still preempted because they interfere with the methods that federal law has chosen to achieve those goals. *See International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). However, the Wellses do not argue that Great Dane should have *replaced* the reflector system that Standard 108 required. Rather, the Wellses argue that Great Dane should have *supplemented* the standard reflector system with additional equipment, especially reflective tape. In fact, Standard 108 contemplated such additional equipment provided that the materials met the normal performance standards. *See* 49 C.F.R. § 571.108, S4.1.3 (1986) ("No additional lamp, reflective device, or other motor vehicle equipment shall be installed that impairs the effectiveness of lighting equipment required by this standard."); 49 C.F.R. § 571.108, S4.1.1.4 (1986) ("Reflective material ... may be used for side reflex reflectors" so long as it meets performance standards.). Standard 108 also stated that, with some exceptions that do not apply, "each vehicle shall be equipped with *at least* the number of lamps, reflective devices, and associated equipment specified." 49 C.F.R. § 571.108, S4.1.1 (1986) (emphasis added).

These provisions together show that the 1986 Standard 108 only impliedly preempts additional equipment that would have interfered with a trailer's ability to meet the standard's minimum, general conspicuity requirements. The Wellses' claims do not create such an interference.

■■■ Great Dane attempts to distinguish between allowing additional reflective equipment and requiring it, citing the National Highway Traffic Safety Administration's interpretations of Standard 108. However, what these agency opinions actually decide is that *state legislators* and *state agencies* may permit, but not mandate, equipment in addition to what Standard 108 requires. We recognize that under the Safety Act's preemption clause, state legislators and agencies are prohibited from enacting heightened requirements. *See* 15 U.S.C. § 1392(d) (recodified at 49 U.S.C. § 30103(b)) ("Whenever a Federal motor vehicle safety standard ... is in effect, no State or political subdivision of a State shall have any authority either to establish, or continue in effect ... any safety standard applicable to the same aspect of performance ... which is not identical to the Federal standard."). But the Safety Act's saving clause allows states to impose higher standards-assuming they do not actually conflict with a federal law's or regulation's purposes-through the state's common law. *See* 15 U.S.C. § 1397(k) (recodified at 49 U.S.C. § 30103(e)) ("Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."); *see also Geier,* 529 U.S. at 868, 120 S.Ct. 1913 ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions...."). In other words, Congress structured the Safety Act so that states may indeed impose higher stan-

dards than those found in the Safety Act's regulations-but only through the common law.

We recognize that our holding that the Wellses' state tort claims are not impliedly preempted may seem counterintuitive; a manufacturer could have complied with Standard 108 as it existed in 1986 but still be exposed to state tort claims. *See* Rabin, *Reassessing Regulatory Compliance*, 88 GEO. L.J. 2049, 2060 (2000); Dinh, *Reassessing the Law of Preemption*, 88 GEO. L.J. 2085, 2115 (2000). Nevertheless, *Geier's* implied preemption analysis, together with the federal standard that existed in · 1986, dictate our conclusion.

## 2. NO CONFLICT WITH UNIFORMITY

Great Dane's second argument is that the Wellses' common-law claims actually conflict with the Safety Act and Standard 108 because they defeat the federal goal of national uniformity in the area of motor vehicle safety features. Great Dane asserts that Standard 108's history and purpose reflect the Secretary's belief that lights and reflectors need to be standardized to promote reliable expectancy in drivers. Great Dane further contends that common sense dictates that standardizing lighting and reflector systems helps drivers judge other vehicles' presence. Great Dane claims that uniformity in trailer conspicuity is especially important because motorists must be able to identify trailers and recognize them as potential hazards. Here, Great Dane argues, uniformity has even greater importance in Standard 108's context than in Standard 208's context in *Geier*, because uniform conspicuity requirements affect other drivers' performance. Also, Great Dane asserts that lighting and reflector systems should be uniform to prevent manufacturers from being subjected to different requirements that juries may set in different states.

But as we have already discussed, the Safety Act allows state common law to establish higher, non-conflicting standards. *See* 15 U.S.C. § 1397(k) (recodified at 49 U.S.C. § 30103(e)); *Geier*, 529 U.S. at 868, 120 S.Ct. 1913. Moreover, uniformity has not been the Secretary's primary goal over the years. As previously discussed, the Secretary conducted studies involving alternative conspicuity schemes, including a study on almost four thousand trucks that drove over one-hundred million miles during the testing period. *See* 52 Fed.Reg. 35345, 35346 (1987). The Secretary's purpose was to gather data about various conspicuity patterns and materials. It was not until 1992 that the Secretary amended Standard 108 to provide that all trailers manufactured after December 1993 must have a specific reflective pattern. *See* 57 Fed.Reg. 58406, 58413 (1992) (codified at 49 C.F.R. 571.108, S5.7). And it was not until 1999 that the Secretary required that older trailers be retrofitted to comply with the amended standard. *See* 64 Fed.Reg. 15588, 15605 (1999); 49 C.F.R. § 393.13(b) (1999). Thus, during the relevant time period, not even the agency that issued the standards believed that uniformity should take precedence over the possible safety advantages of increased visibility.

Also, as the Wellses point out, Great Dane must have believed it was free to supplement the federal standard; it installed additional visibility equipment as early as 1978 when customers ordered and paid for it. And, as a practical matter, it is doubtful that drivers who already understood that three lights and three reflectors (Standard 108's minimum requirements) indicated a trailer's side would drive into the side because it had additional reflective tape on it.

Additionally, when Great Dane manufactured its trailer, the Safety Act reflected "a congressional determination that occa-

sional nonuniformity is a small price to pay for a system in which juries not only create, but also enforce, safety standards, while simultaneously providing necessary compensation to victims." *Geier,* 529 U.S. at 871, 120 S.Ct. 1913. This policy by itself "disfavors pre-emption, at least some of the time." *Geier,* 529 U.S. at 871, 120 S.Ct. 1913. And, in general, the Safety Act and its regulations provide adequate room for state tort law to operate, particularly because Standard 108 created only a floor, that is, a minimum standard. *See Geier,* 529 U.S. at 868, 120 S.Ct. 1913. These principles strongly imply that Standard 108 does not preempt the Wellses' common-law claims, especially considering the general presumption that Congress does not intend to displace state law. *See Maryland,* 451 U.S. at 746, 101 S.Ct 2114.

### 3. OTHER COURTS

Furthermore, the weight of case law supports our conclusion that Standard 108, as written in 1986, does not impliedly preempt common-law claims about insufficient trailer conspicuity. The leading case is *Buzzard v. Roadrunner Trucking, Inc.,* 966 F.2d 777 (3d Cir.1992). In *Buzzard,* the Third Circuit anticipated the Supreme Court's *Geier* analysis and held that the Safety Act does not expressly preempt common-law claims. *Buzzard,* 966 F.2d at 781. The Third Circuit also held that the Safety Act may impliedly preempt such claims if they actually conflict with the federal statute or regulation. *See Buzzard,* 966 F.2d at 781. The *Buzzard* court noted that it had previously determined, for the same reason *Geier* later articulated, that no-airbag common-law claims did conflict with the Safety Act and Standard 208. *Buzzard,* 966 F.2d at 781 (discussing *Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1123 (3d Cir.1990)). But, unlike the no-airbag cases, the *Buzzard* court then determined that a common-law claim seeking additional conspicuity safety equipment did not conflict with the Safety Act or Standard 108:

> Encouraging manufacturers to act in a way that increases safety does not frustrate the primary purpose of the Safety Act. Nor does it make it impossible to comply with both federal and state law, as it does not suggest that illumination equipment mandated by state common law be used *instead* of that required by federal law, but only *in addition* to that specified in Standard 108. To the extent Buzzard can show there is other equipment that increases conspicuity without reducing the effect of the required equipment, his action does not actually conflict with the Safety Act or Standard 108. So limited, actions like Buzzard's aid the development of feasible lighting systems that improve on the illumination provided by compliance with Standard 108 and thereby aid federal law in developing illumination design standards to meet the needs of modern motorists.

*Buzzard,* 966 F.2d at 785 (footnote omitted); *see also Harris v. Great Dane Trailers, Inc.,* 234 F.3d 398, 403 (8th Cir.2000) (Standard 108 before 1992 did not impliedly preempt state tort claims imposing heightened conspicuity requirements); *Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1122 (3d Cir.1990) (the Safety Act does not impliedly preempt common-law action unless common-law claim presents an actual, direct conflict with the statute's scheme); *Swope v. STI Transit Co.,* 796 F.Supp. 160, 164 (E.D.Pa.1992) (Standard 108 did not preempt common-law claims arising from a 1988 accident); *Derby v. Brenner Tank, Inc.,* 187 Wis.2d 244, 522 N.W.2d 274, 276 (1994) (former Standard 108 did not preempt common-law conspicuity claims).

Great Dane relies on *Crowe v. Fleming,* 749 F.Supp. 1135 (S.D.Ga.1990), to support

its implied preemption argument. In *Crowe,* the district court ruled that Standard 108 impliedly preempted a plaintiff's claim that the defendant's trailer should have been equipped with improved reflective materials. 749 F.Supp. at 1137. However, *Buzzard* explicitly disavowed *Crowe.* 966 F.2d at 785–86. And, as *Buzzard* correctly points out, the *Crowe* court improperly assumed that the Supreme Court's deciding that Standard 208 impliedly preempts no-air bag claims necessarily requires a determination that Standard 108 likewise preempts a common-law conspicuity claims. *Buzzard,* 966 F.2d at 785–86 (citing *Crowe,* 749 F.Supp. at 1139–41); *see also Swope,* 796 F.Supp. at 164 (rejecting the analysis in *Crowe* that led the court there to conclude that the common-law conspicuity claims are impliedly preempted); *Derby,* 522 N.W.2d at 276–77 (adopting reasoning in *Buzzard* to conclude that Standard 108 does not impliedly preempt common-law conspicuity claims).

Great Dane also relies on *Lady v. Neal Glaser Marine, Inc.,* 228 F.3d 598 (5th Cir.2000), in which the Fifth Circuit examined a federal regulation's preemptive effect on a tort claim that a manufacturer should have equipped its boat with a propeller guard. The court reviewed the history of the decision by the agency regulating boat safety that, as a substantive matter, it was not appropriate to impose a propeller guard requirement. *Lady,* 228 F.3d at 612–15. The court then concluded that the agency's affirmative decision took on the character of a regulation. *Lady,* 228 F.3d at 615. Accordingly, the court held that the plaintiff's common-law claim that the boat manufacturer must provide a propeller guard presented an obstacle to and frustrated the agency's flexible approach toward propeller guards. *Lady,* 228 F.3d at 614–15.

In reaching its holding, the *Lady* court recognized that the plaintiff's common-law claims would effectively require boat manufacturers to install propeller guards, directly contravening the agency's policy against mandating such a device. *Lady,* 228 F.3d at 614–15. Thus, a distinction exists between *Lady* and this case. Here, Standard 108 clearly sets forth a minimum standard, rather than stating what is not required, thereby allowing state tort claims to require additional equipment so long as this additional equipment does not conflict with the minimum safety standards.

## IV. CONCLUSION

Allowing the Wellses to pursue their common-law claims does not interfere with the Secretary's important means-related federal objectives in promulgating the 1986 Standard 108. Nor do their common-law claims conflict with the Safety Act's and Standard 108's uniformity requirements. Accordingly, we hold that the Safety Act and Standard 108 do not impliedly preempt the Wellses' common-law conspicuity claims. Therefore, we affirm the court of appeals' judgment.