In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-02-173 CV


____________________



WARNER-LAMBERT COMPANY, PFIZER, INC., BAYER CORPORATION, 


DEL PHARMACEUTICALS, INC., DEL LABORATORIES, INC., AND 


CARE TECHNOLOGIES, INC., Appellants



V.



KATHERINE MILLS AND VERONICA EVANS, INDIVIDUALLY


AND ON BEHALF OF OTHERS SIMILARLY SITUATED, Appellees






On Appeal from the 163rd District Court


Orange County, Texas


Trial Cause No. B-010023-C






OPINION



 This is an interlocutory appeal of an order certifying a class action. See Tex. Civ.
Prac. & Rem. Code Ann. § 51.014(a)(3) (Vernon Supp. 2003). Appellants initially
complain that the trial court lacked jurisdiction to enter the class certification order because
federal law preempts appellees' state law causes of action. Appellants' contend that we
have jurisdiction to entertain this issue, and that we must first determine subject matter
jurisdiction before we can address any other issue relating to the class certification. 

 Appellate court jurisdiction of the merits of a case extends no further than that of
the court from which the appeal is taken. Pearson v. State, 159 Tex. 66, 315 S.W.2d 935,
938 (1958). If the trial court lacked jurisdiction, then an appellate court only has
jurisdiction to set the judgment or order aside. Dallas County Appraisal Dist. v. Funds
Recovery, Inc., 887 S.W.2d 465, 468 (Tex. App.- -Dallas 1994, writ denied); see also
Fulton v. Finch, 162 Tex. 351, 346 S.W.2d 823, 827 (1961). The fact that the instant
cause is before us under an otherwise limited right-of-appeal is of no import. As the Texas
Supreme Court has observed, § 51.014(a)(3) of the Civil Practice and Remedies Code does
not supplant the constitutional requirement that a reviewing court have subject matter
jurisdiction. See McAllen Med. Center, Inc. v. Cortez, 66 S.W.3d 227, 231 (Tex. 2001). 
 Federal preemption of state law is grounded in the Supremacy Clause of the United
States Constitution, which provides that "the Laws of the United States . . . shall be the
supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing
in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST.,
art. VI, cl. 2. Where a state law comes into conflict with federal law, the state law is
preempted and "without effect." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct.
2114, 68 L.Ed.2d 576, 595 (1981). 

 Preemption may take one of several forms. A federal law may expressly preempt
a state law. See Great Dane Trailers, Inc. v. Estate of Wells, 52 S.W.3d 737, 743 (Tex.
2001). Federal law may also preempt a state law impliedly, either (1) when the scheme
of federal regulation is sufficiently comprehensive to support a reasonable inference that
Congress left no room for supplementary state regulation ("field preemption"), or (2) if
the state law actually conflicts with federal regulations ("conflict preemption"). Id. State
law presents an actual conflict when a party cannot comply with both state and federal
regulations or when the state law would obstruct Congress' purposes and objectives. Id. 
 "The purpose of Congress is the ultimate touchstone" in every preemption case. 
See Retail Clerks Int'l Ass'n v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11
L.Ed.2d 179 (1963). Congressional intent may be discerned from the statute's language
and structure, as well as other factors. Medtronic, Inc. v. Lohr, 518 U.S. 470, 486, 116
S.Ct. 2240, 135 L.Ed.2d 700, 716 (1996). The purpose of the statute is revealed through
"the reviewing court's reasoned understanding of the way in which Congress intended the
statute and its surrounding regulatory scheme to affect business, consumers, and the law." 
Id. 

 This case concerns the Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301 - 397
(1999) (FDCA or Act). The Act's preemption provision provides in part that no state
"may establish or continue in effect" any "requirement" that "relates to the regulation" of
an over-the-counter drug and that is "different from or in addition to, or that is otherwise
not identical with, a requirement" under the FDCA. See 21 U.S.C.A. § 379r. A state law
action may impose a "requirement" under state law, and therefore be preempted when the
state law requirement conflicts with a requirement imposed by federal law. See Worthy
v. Collagen Corp., 967 S.W.2d 360, 370 (Tex. 1998) (holding state law damage causes
of action imposed "requirements" within the meaning of the Medical Devices Act
preemption provision). Our preemption analysis looks at whether the state requirement
sought to be imposed by this lawsuit is "different from or in addition to, or that is
otherwise not identical with" a federal requirement under the Act. See 21 U.S.C.A. §
379r. 

 Our review of the lawsuit and the Act must be conducted within the context of the
trial court's certification order, which limited the causes of action appellees were permitted
to pursue. Those portions of the certification order are as follows:

 The Court finds that the issues that will "occupy most of the efforts of the
litigants and the court" are these: (1) Did the Defendants misrepresent their
products through their advertising, promotion and marketing practices? (2)
Were the Defendants' products fit for the ordinary purposes for which they
were to be used? (3) Could the Defendants' products pass without objection
in the trade under the contract description? (4) Did the Defendants' products
conform to the promises or affirmations of fact made in their advertising and
marketing? (5) What was the value of the Defendants' goods as accepted by
Plaintiffs at the time and place of acceptance? These are marketing issues,
not injury or causation issues. Because the Defendants' marketing practices
were substantially the same across the country, the Court finds that the proof
on these issues will be common as to all Plaintiffs. 


 Moreover, subsumed within all of the above issues is the even more
fundamental question of whether or not the Defendants' products were
formulated to be effective for the cure and treatment of head lice
infestations. This is the more precise question on which most of the efforts
at trial will focus. Through lay and expert testimony, anecdotal evidence,
and documentary evidence, the court is convinced the parties will show
whether the products were or were not properly formulated to cure head lice
infestations, and whether or not the Defendants knew this when they were
advertising and promoting the products. . . . Most importantly, this question
of whether or not the Defendants' products conformed with the affirmations
of fact made on their packages, labeling and advertising is a question that is
exactly the same for all Plaintiffs in the class. 


 ************


 Causation regarding the breach of warranty claim can easily be determined
as to all class members as a common issue, and will not run afoul of the
requirement that causation be determined as to individuals and not groups. 
The Plaintiffs will be required to prove that (1) the goods bought and sold
were subject to an implied warranty of merchantability, (2) the goods were
defective at the time of sale, (3) the defective nature of the goods caused
plaintiffs' injuries, and (4) damages were suffered as a result. If the
products the Defendants sold are found to be chemically and scientifically
ineffective for the cure for Texas head lice infestations, then that will be a
producing cause of the plaintiffs' economic loss regardless of what occurred
after the consumer purchased the product. Either the product was properly
formulated to be an effective cure for Texas head lice infestations at the time
it left the Defendants' hands, or it was not. Thus, causation will not require
individual proof, but can be determined on a class-wide basis. 


 ************


 Based on the foregoing, and on the evidence that has been presented to the
court in support of certification, the court finds that the following causes of
action should be certified in this action: 1) Breach of Implied Warranty under
Tex. Bus. & Com. Code Ann. § 17.50(a)([2]); 2) Breach of Implied
Warranty of Merchantability under Tex. Bus. & Comm. (sic) Code Ann. §
2.314.


 The Act grants the Food and Drug Administration (FDA), as the designee of the
Secretary of Health and Human Services (HHS), the authority to regulate, among other
items, "drugs." See 21 U.S.C.A. §§ 321(g), 393. In Kanter v. Warner-Lambert
Company, 99 Cal. App. 4th 780, 122 Cal. Rptr. 2d 72 (Cal. App. 2002, review denied),
a case also involving the efficacy of over-the-counter pediculicide (1) products, the court
described in detail the exhaustive process by which the FDA decides whether a drug is
ultimately approved for marketing as "safe and effective." The Kanter court detailed the
pre-market approval process mandated by the FDA as including the following:

 A manufacturer seeking approval of a new drug must submit a detailed new
drug application in accordance with the requirements of the FDCA and
related regulations promulgated by the FDA. (§ 355(b)(1); 21 C.F.R. §§
314.1 - 314.3, 314.50 (2001).) Among other information, a new drug
application must include "substantial evidence" that the drug is safe and
effective, meaning "evidence consisting of adequate and well-controlled
investigations, including clinical investigations, by experts qualified by
scientific training and experience to evaluate the effectiveness of the drug
involved, on the basis of which it could fairly and responsibly be concluded
by such experts that the drug will have the effect it purports or is represented
to have under the conditions of use prescribed, recommended, or suggested
in the labeling or proposed labeling thereof." (§ 355(d); see 21 C.F.R. §
314.26 (2001) [explaining characteristics of "adequate and well-controlled
study"].) 


 A new drug application must also include "specimens" of the labeling
proposed for the drug. (§ 355(b)(1)(F); see 21 C.F.R. §§ 314.50(c)(2)(i)
(2001) [application must include proposed text of labeling], 201 et seq.
(2001) [general labeling provisions].) If the FDA determines that the
labeling of a new drug is false or misleading in any particular, the drug is
deemed "misbranded." Whether labeling is false or misleading depends not
only on its stated or suggested representations, but also on the extent to
which it fails to reveal any material facts. (§§ 352(a), 321(n).) The
application will be refused if the FDA determines that the labeling is false
or misleading in any particular, if the application contains an untrue
statement of a material fact, or if the proposed labeling does not comply with
the requirements established in the regulations. (§ 355(d)(7); 21 C.F.R. §
314.125(b)(6), (7), (8) (2001).)


Kanter, 122 Cal. Rptr. 2d at 76-77. 

 The FDA may withdraw approval of a drug, after notice and a hearing, "on the
basis of new information before [the Secretary of Health and Human Services] with respect
to such drug, evaluated together with the evidence available to him when the application
was approved, that there is a lack of substantial evidence that the drug will have the effect
it purports or is represented to have under the conditions of use prescribed, recommended,
or suggested in the labeling thereof[.]" See 21 U.S.C.A. § 355(e)(3); 21 C.F.R. § 12.1
et seq. Subchapter III of the Act contains extensive policing provisions available to the
FDA, includes a list of prohibited acts with accompanying civil and criminal penalties
applicable to both individual and corporate violators, and provides for injunctive relief. 
See 21 U.S.C.A. §§ 331 - 337. The Act limits injunctive proceedings to "district courts
of the United States and United States courts of the Territories," and provides "all" other
proceedings "for the enforcement, or to restrain violations, of [the FDCA] shall be by and
in the name of the United States." See 21 U.S.C.A. § 332, 337(a). 

 FDA regulations specify the active ingredients required to be included in a
nonprescription pediculicide drug product in order for the product to be recognized as
effective. See 21 C.F.F. §§ 330.10 & 358.601, 358.610 (2003). The regulations also
specify labeling requirements. 21 C.F.R. § 358.650 (2003). In examining the certification
order, and the pleadings at trial and the arguments on appeal, we see no claim that the
formula of the products in question ("NIX," "RID," "PRONTO," and "CLEAR LICE"),
which was approved by the FDA as "safe and effective" for sale to the general public, was
tampered with, changed, re-constituted, or adulterated by appellants. Appellees' lone
contention is that the formula, as approved by the FDA, simply does not kill lice. 
Appellees do not contest the fact that the products in question do indeed comply with the
FDA-approved formula for nonprescription pediculicide drug products, and that the
products were marketed in compliance with the appropriate approval process mandated by
the FDA. See 21 C.F.R. § 330.10. 

 As the trial court detailed in its certification order, the issue in this case is not
merely whether appellants' products "work or not," but how the products in question were
"formulated." This case does not involve a manufacturing defect, or a claim that some
batch of the pediculicides in question did not conform to the FDA regulations; the crux of
the claim is that the FDA-specified active ingredients are ineffective. The trial court's
certification order would permit "lay and expert testimony, anecdotal evidence, and
documentary evidence" as proof that "the products were or were not properly formulated"
as an effective treatment for head lice infestation. An additional issue to be litigated would
be whether or not appellants knew of any alleged ineffectiveness of their products "when
they were advertising and promoting the products." Appellees would attempt to prove that
appellants' products were "chemically and scientifically ineffective for the cure of Texas
head-lice infestations." It appears appellees would attempt to prove the FDA regulation --
which specifies the active ingredients that must be included if the product is to be
considered effective -- is simply incorrect, and that appellants' products should not contain
the active ingredients specified by the FDA if they are to be marketed in Texas as a
treatment for head-lice infestation. In practical effect, the state lawsuit would make
unlawful the sale of a product formulated to comply with a federal requirement. This
litigation would impose a state requirement that is "different from or in addition to, or that
is otherwise not identical with," a requirement under the Act. See 21 U.S.C.A. § 379r;
see generally Worthy, 976 S.W.2d at 370 (state lawsuits may be "requirements" preempted
by federal law). 

 We conclude appellees' claims, as certified by the trial court, conflict with the
FDA's specific requirements for active ingredients and labeling of pediculicide drug
products. (2) What appellees refer to as the "statutory savings clause," 21 U.S.C.A. §
379r(e), which explicitly exempts state "products liability" causes of action from the
otherwise preemptive provisions of § 379r, does not aid appellees' position. That
Congress included specific exemption language within § 379r suggests Congress' intent to
preempt all other statutory or common-law state causes of action. Furthermore, the
products liability exception is not available to appellees in the instant litigation, as
appellees have expressly disavowed any personal injury or other physical impairment from
the use of appellants' products and they are not claiming the product damaged some other
property. Tex. Civ. Prac. & Rem Code Ann. § 82.001(2) (Vernon 1997), defines
"products liability action" as any action against a manufacturer or seller for recovery of
damages arising out of "personal injury, death, or property damage" allegedly caused by
a defective product. No product liability cause of action has been certified by the trial
court in the instant litigation. 

 We hold that the scope of the causes of action to be litigated, as contained in the
trial court's order certifying the class action, are preempted by federal law. The trial court
was without subject matter jurisdiction to certify these claims as a class action lawsuit. 
Appellants' first appellate issue is sustained. The certification order is vacated, and the
case is remanded for further proceedings consistent with this opinion.

 TRIAL COURT'S CERTIFICATION ORDER VACATED; CAUSE REMANDED.

 _________________________________

 DAVID B. GAULTNEY

 Justice


Submitted on June 12, 2003

Opinion Delivered September 11, 2003


Before McKeithen, C.J., Burgess and Gaultney, JJ.

DISSENTING OPINION


 I respectfully dissent. The majority holds this action is preempted by the FDA
regulations; I disagree. The majority states: "In practical effect, the state lawsuit would
make unlawful the sale of a product formulated to comply with a federal requirement." 
The state lawsuit does not seek to prohibit the sale of the product, quite the contrary, it
only seeks to afford the plaintiffs a remedy not afforded under the FDA scheme -
restitution of the amounts paid for the products. I would overrule appellants' first issue
and consider the interlocutory appeal on its merits.




 DON BURGESS

 Justice

Dissent Delivered

September 11, 2003

1. "Pediculicide drug product. A drug product for the treatment of head, pubic
(crab), and body lice." 21 C.F.R. § 358.603.
2. What is not before us and we are not deciding is any claim or allegation that a
particular nonprescription pediculicide does not contain the FDA-approved active
ingredients: "the combination of pyrethrum extract (providing a concentration of pyrethrins
of 0.17 to 0.33 percent) with piperonyl butoxide (2 to 4 percent) in a nonaerosol dosage
formulation." See 21 C.F.R. § 358.610.